## RUUD MFG. CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 4290.

Circuit Court of Appeals, Third Circuit.

Nov. 8, 1930.

Maynard Teall and Smith, Shaw, McClay & Seifert, all of Pittsburgh, Pa., for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and Norman D. Keller and J. Louis Monarch, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and E. Riley Campbell, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before BUFFINGTON and DAVIS, Circuit Judges, and JOHNSON, District Judge.

DAVIS, Circuit Judge.

This case is here on petition of the taxpayer to review the decision of the Board of Tax Appeals involving taxes for the years 1920 and 1921.

The petitioner is a New Jersey corporation, which during the taxable years in question had its principal office in Pittsburgh, Pa., and was engaged in the manufacture and sale of gas water heaters.

Prior to 1913, the Humphrey Company, a Michigan corporation, was engaged in a like business in Kalamazoo, Mich. All its stock, except shares necessary to qualify directors, was owned by Mr. H. F. Humphrey. On March 24, 1913, the Ruud Company and the Humphrey Company entered into a written agreement for the purchase of the assets, including good will and patents, issued and pending, of the Humphrey Company by the Ruud Company. In consideration for the conveyance of the property to the Ruud Company, it issued to the Humphrey Company 290 shares of its common stock, par value $100. The contract of sale further provided that not later than six months from the date thereof, it would increase its capital stock by authorizing an issue of one million dollars preferred nonvoting cumulative 7 per cent. stock which should take precedence of its existing issue of stock, and distribute the same to the two companies "in the nature of a stock dividend out of surplus" upon the basis of the respective value of the net assets of the two companies, which was to be determined by an appraisement.

The appraisement was made, and after an adjustment of $25,000 with regard to patent litigation, the assets of the petitioner were found by the appraisers to be worth $607,000 and those of the Humphrey Company $316,-000. The 290 shares of common stock were transferred to the Humphrey Company, which thereupon conveyed its assets apparently including good will and patents to the petitioner. Thereafter in performance of the agreement the petitioner increased its capital stock by authorizing the issuance of preferred stock to the amount of $1,000,000. It conveyed 3,160 shares of this stock, valued at $316,000, to the Humphrey Company, and retained 6,070 shares, valued at $607,000, for itself.

The number of shares of the common stock was at the same time increased to 5,-000, at $100 par. This was an increase of 3,-388 shares of common stock. There had been previously issued 1,612 shares, and of these 290 had been conveyed to the Humphrey Company and 1,322 were held by the Ruud Company. Of the 3,388 shares, 609 were given to the Humphrey Company, making a total of 899 shares valued at $89,900, which it then had, and 2,779 were retained by the Ruud Company, making a total of 4,101 shares which it had.

The petitioner contends that in addition to the net tangibles worth $316,000, the Humphrey Company had intangibles consisting of good will and patents which the Ruud Company acquired in the purchase for which it paid $89,900 in common stock which included the 290 shares mentioned above; that this intangible property belonged to invested capital, and instead of including it therein, the commissioner excluded it and enough more in addition to amount to $103,159.33; that by thus reducing its invested capital, he increased its tax rate and caused a deficiency in its taxes for the years 1920 and 1921. The deficiency for 1920 was found by the commissioner to be $8,717.15 and for 1921, $7,-312.63.

The commissioner, on the other hand, says that his determination is presumptively correct; that the petitioner has not borne the burden of showing it to be erroneous; that the evidence does not show the amount of invested capital allowed or excluded by him, nor the amount of capital stock outstanding on March 3, 1917; that the evidence does not show the value of the good will acquired from the Humphrey Company. Consequently the redetermination of the board should be affirmed.

The difficulty with the contention of the petitioner is that it is not supported by the evidence. The contract expressly states the consideration for which the 290 shares of common stock were given. The evidence further shows that 3,160 shares of preferred stock and 609 shares of common stock were issued in the nature of stock dividends out of surplus.

The petitioner itself, notwithstanding its allegations, is not clear as to the consideration for which the 899 shares of common stock were given to the Humphrey Company. It reaches the conclusion that they paid for intangible property, not from direct testimony, but from circuitous reasoning based upon documentary evidence. It argues that they must have been given for something, and since, as it assumed, all the net tangibles were paid for by the 3,160 shares of preferred stock, and it can find nothing for which these shares of the common stock were issued, they must have been used to pay for intangibles. But as a matter of fact the petitioner does not, and from the evidence cannot, say whether the 899 shares of common stock were issued for good will alone, or for patents alone, or for both, and if for both, the amount

allocated to each, or whether part of it was issued for tangible and part for intangible property or part for earnings of either tangible or intangible property or for both. Mr. Arundell, speaking for the Board of Tax Appeals, summed up the situation as follows:

"The evidence before us on the question of the value of any good will acquired for stock is confined to gross sales, profits and losses, advertising expenditures and net tangibles of the Humphrey Company prior to the merger, and of the Humphrey Division of petitioner subsequent to that event. We are asked to determine from that evidence that the Humphrey Company was possessed of a valuable good will which became the property of the petitioner by reason of the merger, and of the transfer of the business of the Humphrey Company to petitioner, and to determine, from the same evidence, what the value of such good will may have been. We are asked to assume that all earnings of the Humphrey Company in excess of a fair return upon its net investment in tangible properties are directly attributable to good will, and to capitalize such excess earnings at either 10, 15 or 20 per cent., and accept the result as reflecting the fair value of the good will. We decline, for obvious reasons, to take that course. We might just as well assume that all of the earnings in excess of a fair return on the tangibles were attributable directly to patents. The Humphrey Company was a manufacturing organization, and patents were specifically included in the transfer of assets to the petitioner. The evidence does not justify one of these assumptions in preference to the other. Nothing has been given to us in the way of evidence as to the background of the successes and reverses of the Humphrey Company. We know nothing whatever as to its business policies, particularly as they affected the company's relations with its customers, as to the steps taken toward the development of markets for its products, and as to the reputation of its products as to grade, quality, and serviceability. Without this background, any conclusion that we might draw from the mere application of a formula to earnings, would be entirely a matter of conjecture."

 As above stated, the determination of the commissioner is presumptively correct, and the burden was on the petitioner to prove it to be erroneous. Bishoff v. Commissioner of Int. Rev. (C. C. A.) 27 F.(2d) 91; Reinecke v. Spalding, 280 U. S. 227, 50 S. Ct. 96, 74 L. Ed. 385; United States v. Anderson, 269 U. S. 422, 46 S. Ct. 131, 70 L. Ed. 347;

United States v. Mitchell, 271 U. S. 9, 46 S. Ct. 418, 70 L. Ed. 799; Wickwire v. Reinecke, 275 U. S. 101, 48 S. Ct. 43, 72 L. Ed. 184. No clear evidence was submitted from which it could be logically concluded that the redetermination was erroneous, and in the absence of such evidence, the decision of the board must be affirmed on this point. J. R. Johnson & Co., Inc. v. Noel (D. C.) 26 F.(2d) 670.

 The second question in this case is the disallowance by the commissioner of $4,917.92 paid to the Dominion of Canada under the Business Profits War Tax Act of 1916 for the years 1918 and 1919. The amount for 1918 was $1,375.46, and for 1919 $3,542.46, both aggregating $4,917.92. The board sustained the commissioner on two grounds: (1) The full text of the Business Profits War Tax Act of 1916 was not in evidence, and consequently it could not say that the taxes were income war profits or excess profits taxes and so entitled to be credited in its income tax return with the payment of these taxes. (2) The board was unable from the evidence before it to say that the taxes did not accrue and become payable prior to 1921.

Section 238(a) of the Revenue Act of 1921 (42 Stat. 258) provides that:

"In the case of a domestic corporation the tax imposed by this title, plus the war-profits and excess-profits taxes, if any, shall be credited with the amount of any income, war-profits, and excess-profits taxes paid during the same taxable year to any foreign country, or to any possession of the United States."

The evidence is positive that the taxes were paid on July 20, 1921. The petitioner did not know anything whatever about these taxes until some time in June of that year, when it was informally notified of their existence by the Canadian government. In July the petitioner received formal notices of the assessment, and the taxes were paid on the 20th of that month.

The petitioner filed with its income tax return for 1921 the form required to be filed by taxpayers claiming credit for foreign taxes.

Paragraph 5(d) of the answer filed in this case admits the payment of the tax, but denies that it was a proper deduction because it alleged that the tax accrued in 1919. Section 13 of the Business Profits War Tax Act provides that, "the tax shall be paid each year within one month from the date of the mailing of the Notice of Assessment." The no-

tices of assessment were in evidence and they quoted this provision. As above stated, these notices were not received until July, 1921. We think that there was uncontradicted evidence before the board from which it could find, and should have found, that the taxes were business profits war taxes and that they did not accrue and become payable until notices of assessment were received in 1921. Consequently the petitioner should have been credited with the payment of them in that year.

Therefore the determination of the commissioner and redetermination of the board excluding $103,159.33 from invested capital of the petitioner is affirmed, but in refusing to credit the taxpayer with the $4,917.92 paid to the Canadian government in 1921 they are reversed, and the income tax return of the petitioner as to this item is approved.