HANSON v. UNITED STATES.

No. 47590.

United States Court of Claims.
Oct. 2. 1950.
As Amended Dec. 13, 1950.

The Court, upon the evidence, the report of Commissioner Richards H. Akers, and the briefs and arguments of counsel, makes the following

### Special Findings of Fact

1. The original plaintiff in this proceeding, Glenn I. Hanson, died June 29, 1948. Mary E. Hanson, the special administratrix of his estate, has been substituted as plaintiff herein. For convenience in these findings, the word "plaintiff" refers to Glenn I. Hanson or the Star Engineering Company (hereinafter described) as the context may indicate.

2. In October, 1944, plaintiff and A. A. Simpson entered into a partnership which operated under the name of the Star Engineering Company in and near Los Angeles, California. Its capital investment, as shown by its books at October 1, 1944, was $8,005.24. The contract involved in this suit was executed by and between that partnership and defendant. After the termination of the contract by defendant and after plaintiff had filed its first claim under the termination, the partnership was dissolved. By an assignment on December 10, 1945,

Simpson transferred all his interest in the partnership, including the claim herein, to plaintiff.

3. In October, 1944, defendant's contracting officer, Captain Robert L. Spear of the Philadelphia, Army Signal Corps Procurement District, went to Los Angeles, California, for the purpose of negotiating a contract for the reclamation of used Signal Corps wire. Prior to that time the reclamation of old or used wire had not been undertaken—at least on a large scale. Hanson had no previous experience in reclaiming wire and had no facilities for the type of work involved. He had no technical engineering training but he was mechanically inclined and prior to World War II had experience in operating a station for the repair of heavy-duty equipment such as large road equipment, including tractors and compressors, where he had from five to seven employees. After the outbreak of the War, he had been engaged as a subcontractor under radar contracts for the Government where he had two hundred or more employees. The other partner, Simpson, was an accountant and office man. Upon the recommendation of the local Signal Corps officials, the contracting officer offered a contract to Hanson because of his availability and the fact that on previous Army radar contracts his work had been found satisfactory, and convinced Hanson that he should undertake the work. All negotiations were carried on with Hanson acting for the partnership. Hanson and the contracting officer were in accord, during the negotiations, that any price then fixed would be highly speculative and should be subject to revision from time to time as operating costs were determined under the contract. While Hanson was at first reluctant to undertake the operation because of his lack of experience and lack of facilities, the contracting officer assured him that he would not suffer any loss by reason of his performance of the proposed work.

4. In accordance with the discussions referred to in the preceding finding, plaintiff submitted a proposal on October 16, 1944, which was prepared by him with the assistance of the contracting officer, for reclaiming 5,587 miles of used wire at $35 per mile, and on October 17, 1944, the contracting officer ordered plaintiff to proceed with the operation. Plaintiff started work the following day or shortly thereafter.

Robert W. Kenny, Los Angeles, Cal., for plaintiff. Morris E. Cohn, Hollywood, Cal., on the brief.

Carl Eardley, Washington, D. C., and Assistant Attorney General H. G. Morison, for defendant.

Before JONES, Chief Judge, LITTLE-TON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This case arises under the Contract Settlement Act of 1944 and is for the recovery of costs allegedly resulting from the termination by the defendant of a war contract. The facts have been set out in detail in our findings and will be referred to herein only to the extent necessary to make clear our conclusions. As shown at the beginning of our findings, the present plaintiff is the special administratrix of the original plaintiff, Glenn I. Hanson (sometimes referred to as "Hanson"), who died during the course of this proceeding. After the termination of the contract here in question, the partnership, Star Engineering Company, which had entered into the contract, was dissolved and Hanson succeeded to the interest of the other partner including the claim involved herein. Hanson was at all times the guiding spirit in the partnership. For convenience, the term "plaintiff" will be used as referring to Hanson or the Star Engineering Company as the context may indicate, except as to the events which occurred after Hanson's death.

In the fall of 1944 the War Department was desirous of undertaking the reclamation of used Signal Corps wire, a project which had not theretofore been undertaken—at least on a large scale. While Hanson had never had any experience in work of that kind, because of his work on other Government contracts and because of his availability, Government officers offered a contract to him to undertake the work. A formal contract was executed November

10, 1944, under which plaintiff agreed to reclaim 5,587.5 miles of wire at $35 per mile. The mileage was later increased to 32,475 miles. The wire was to be furnished by the Government and payment was to be made on the basis of the number of miles reclaimed. Essentially the contract was one for rendering service. Since it was recognized that the unit cost for the performance of the work could not be accurately estimated at the time of the execution of the contract, it was provided in the contract that periodic adjustments would be made in the unit price as the work progressed, and that was done. In order to carry out its work under the contract, plaintiff purchased certain special facilities and made certain improvements to its plant. In determining the unit cost at the end of the first period, capital items made during that period were included and with their inclusion the contracting officer determined that the unit price as fixed in the original contract was fair and reasonable. In substance, the unit price for the period was determined by dividing the total cost for the period by the number of miles of completed wire reclaimed in that period. Capital expenditures made during the remaining periods were not included in plaintiff's costs for the purpose of redetermining unit prices, the unit price being determined by dividing the operating costs for the period by the number of miles of wire reclaimed. The redetermined price was used as a basis of payment to plaintiff for the next succeeding period.

August 7, 1945, the defendant terminated the contract. At that time plaintiff had reclaimed 6,367.5 miles of wire for which plaintiff has been paid at the unit prices set out in the original contract and the several modifications thereto. After termination, plaintiff filed a claim for work in process and for termination expenses. The contracting officer refused to make any allowance for work in process on the ground that costs therefor had been recovered through the unit prices fixed for the completed wire. He did, however, allow certain items of termination expenses. Thereafter, plaintiff appealed from the decision of the contracting officer to the Appeal Board, Office of

Contract Settlement, which held that the unit prices for completed wire did not reimburse plaintiff for goods in process and that plaintiff was entitled to be paid for the cost of work in process at the date of the termination of the contract. In addition, the Board allowed certain additional items in the termination expenses. However, since the amount allowed by the Board was still substantially less than that claimed by plaintiff, particularly as to work in process, this suit followed.

■ The principal issue in the case relates to recovery for the cost of work in process at the date of termination of the contract. On this issue the defendant contends that plaintiff had no work in process at that time but that even if the Court should hold there was work in process then on hand, no recovery therefor can be allowed for the reason that the cost of work in process was paid for by defendant through the unit prices fixed and paid for the completed wire. Taking the second contention first, Did the unit price for the completed wire include payment for work in process? We think not. This was a fixed-price supply contract under which the defendant agreed to pay plaintiff a unit price for completed units. The unit price was specified in the contract as originally executed. However, because of a lack of experience both on the part of the Government and the plaintiff in work of the nature involved, provision was made for adjustment and readjustment of that price on the basis of experience as the work progressed. During the first period plaintiff completed and delivered 700 miles of wire for which it received payment at the unit price of $35 per mile. During that same period plaintiff had operating costs of $15,770.95, nonrecurring indirect expense of $987.77, and a cost for improvements and special facilities of $5,983.84, that is, total costs during that period of $22,742.56. On the basis of those costs, the contracting officer determined that the unit price of $35 was fair and reasonable and made no adjustment therein. However, he likewise determined on the basis of the operating costs for the first period that a unit price of $24.78 would be fair for the following period and that unit

price was paid. Similarly, unit prices were fixed and paid for subsequent periods. In all cases the plaintiff agreed to the unit prices as finally determined by the contracting officer. In arriving at those unit costs under this yardstick arrangement, no consideration was given to the cost of work in process which was on hand at the beginning or end of a given period. No cost accounting records were maintained from which the cost of work in process could be determined at any given time and no inventory was taken of work in process during the period of operations. In other words, the parties merely used the costs in a given period and the miles of wire completed as a basis of determining the unit price at which plaintiff would be paid in a subsequent period. It was not a case of reimbursing plaintiff for costs *per se* but rather a case of using the costs experienced in one period in order to determine what would be a fair unit price for the completed articles which would be delivered during a succeeding period. Had the work under the contract proceeded until all reclaimable wire had been reclaimed, plaintiff would have been paid (at least substantially so) for all work done through the unit price method set up under the contract. However, with the contract terminated while operations were in progress and with payment being made only for completed articles, it follows that plaintiff has not been paid for the cost of the services which it had performed on whatever work was in process at the date of the termination of the contract.

This brings us to the difficult and perplexing issue in the case, namely, what work was in process at the date of termination. The contention of the plaintiff is that 7,063 miles of wire were in process at that time with percentages of completion varying from 3 to 70 percent, and that the total cost of the work on that wire was $65,135.-27, whereas the defendant contends that there was no work in process. The testimony introduced on the respective sides is in sharp conflict. However, certain facts are not in dispute, from which we conclude that the amount of work in process was far less than that contended for by plaintiff, but that in any event there was some work in process at the date of termination.

At or about the beginning of the operation, the defendant delivered to plaintiff 31,797 miles of wire. During the period of operations plaintiff reclaimed and delivered to defendant 6,367.5 miles of wire. After termination, plaintiff, pursuant to an authorization, disposed of 15,048 miles of wire in various stages and conditions. Other wire had been disposed of as junk or scrap from time to time as the operation progressed. Our question is how much work had been done on the wire which remained on hand and what was the cost of that work.

As shown from our findings, the wire proceeded through three principal stages; namely, elimination, spark testing, and splicing. The first stage was carried out either by visual inspection through which wire was selected and taken directly from piles in the yard to the spark-testing machines, or through the use of elimination machines by which wire was taken from the yard and passed through these machines before going to the spark-testing machines. However, before even reaching the elimination process it was necessary for plaintiff, after the delivery of the wire to the place of operation, to unload and stack the wire. We do know that the wire was unloaded and that certainly some of it at least was stacked. Since no satisfactory cost records were maintained by plaintiff, we do not know the exact cost attributable to this operation. As just shown, the elimination process included both a visual inspection by which wire was selected from the yard and taken directly to the spark-testing machines where little cost was involved, and also machine elimination by which wire was run through the elimination machines before going to the spark-testing machines. It is clear from the evidence that at the date of termination the greater part of the wire which was going to the spark-testing machines was coming directly from the yards without having passed through the elimination machines and that no large amount of wire was on hand ready for spark testing which had passed through the elimination machines.

All wire had to pass through the second stage, spark testing, before going to the third and final stage, splicing. Here again it is clear that the amount on hand at termination which had passed the spark-testing operation was small. The same may be said for the amount on hand ready for splicing. In fact, at the date of termination, wire was moved from the spark-testing stage to the splicing stage as soon as the spark testing was completed and often the splicers had to wait to receive work upon which to proceed. While plaintiff stopped operations immediately upon notice of termination, discussions looking to termination had been proceeding for some time and plaintiff was well aware that a notice to cease work might be received at any time. With that in mind, plaintiff was not proceeding with anything like the momentum it had proceeded with in prior months. Wire was being taken from the lot directly to the different machines in order to keep the operation going and the operators in reduced numbers were moved from one operation to another as the occasion required. From all of this there can be no doubt that the amount in process at the various stages was relatively small—certainly in the more advanced stages far less than shown by the inventory submitted by plaintiff. However, it flies in the face of reality to say that there was not some work in process. During the first six days of August, 267.5 miles of wire were reclaimed as compared with 1,600 for the entire month of July, which shows that plaintiff was certainly functioning in the performance of the contract. The fact that the plaintiff was operating to the very moment of termination and that upon delivery of wire to plaintiff by defendant some service was required to be performed in connection therewith before even the first stage of operation was reached, leaves no doubt in our minds that some work had been performed on the wire on hand at termination; that is, some work was in process.

As to the amount of the inventory, plaintiff urges that the defendant should not now be permitted to question the accuracy of the inventory, as submitted shortly after termination, for the reason that de-

fendant's agencies did not avail themselves of the opportunity to verify the accuracy of the inventory while it was in existence; that with the claim pending the defendant caused all the wire to be removed, thus creating a situation where the questions which now arise can not be resolved; and that therefore some sort of estoppel should arise against the defendant to question the accuracy of the inventory. We disagree. The most that can be said is that plaintiff did submit the claim in question at a time when the wire was available, but that the reason the defendant did not undertake to verify the accuracy of the inventory was that it considered the claim unallowable as a matter of law under the contract. The fact that it was later determined that defendant was wrong in its legal conclusion is not sufficient to relieve plaintiff of the burden in proving the amount of the claim. Plaintiff was well aware, or should have been, that, until the claim was allowed or otherwise disposed of, factual allegations therein were open to question. What records or evidence could have been maintained which would have provided a measure of protection against the eventuality which has now arisen, we shall not undertake to say, though with the removal of the wire from the premises without a verification of the inventory, the least which plaintiff might have done was to have maintained some record which would have aided in the solution of the problem now facing us. In that connection, plaintiff offered the explanation during the trial that some of the records as to the taking of the inventory which were in existence when the claim was submitted had been lost, stolen, or were otherwise unavailable. This, however, was no fault of the defendant. The wire was removed by the defendant in the normal course of winding up the operations and without any design or purpose to defeat plaintiff's claim. We fail to see in these facts sufficient evidence to give rise to estoppel against the Government which would satisfy plaintiff's burden of proof as to the accuracy of the inventory.

An unfortunate circumstance is that Hanson, husband of the present plaintiff, the principal party in carrying on the op-

erations and the individual who testified at length with respect to the taking of the inventory, died during the course of the trial and prior to the time when the major part of the conflicting testimony by defendant was offered. There was therefore no opportunity for him to give his side of the story as opposed to that offered by defendant. In addition, we do not have a situation where a concern is still in existence with all the persons presently available who were there when the operations were carried on. With termination of the contract, the operation went out of existence and the personnel was dispersed. These factors do not relieve the plaintiff of the responsibility to prove the claim. Nevertheless, they are factors which we may well weigh in undertaking to render justice from a maze of contradictory evidence.

■ It would serve no useful purpose to undertake to analyze the voluminous contradictory evidence present. The fact that it is contradictory does not relieve us of the responsibility of undertaking to arrive at some measure of relief since we are satisfied that there was some work in process on hand at the time the contract was terminated. In Cohan v. Commissioner, 2 Cir., 39. F.2d 540, 543, the situation was presented where the Board of Tax Appeals (now Tax Court) had refused to allow certain expense deductions on the ground that the exact expenditures had not been shown although the Board was convinced that some expenditures had been made. In remanding the case to the Board, Judge Learned Hand, speaking for the Circuit Court of Appeals, Second Circuit, said: "The question is how far this refusal is justified, in view of the finding that he had spent much and that the sums were allowable expenses. Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. But to allow nothing at all appears to us inconsistent with saying that something was spent."

■ The Commissioner who heard all of the evidence with one minor exception and saw all the witnesses made a determination of an amount of the work in process. Since satisfactory evidence was not available as to the cost of the different processes, he reduced the wire in process as determined by him to a completed mileage basis and used as the cost for such wire the average cost which was allowed for the total wire reclaimed under the contract. On that basis a total cost of the wire in process at the date of termination was computed by him in the amount of $3,192.48. We consider his determination reasonable under the circumstances and it will not be disturbed.

■ The further contention is advanced by the defendant that a no-cost settlement had been agreed upon between the parties prior to the filing of the claim involved in this suit under which plaintiff is precluded from recovering any amount for work in process. Again we disagree. Shortly prior to termination and when it appeared that the contract would almost certainly be terminated, a representative of the defendant discussed with plaintiff the basis of settlement of the contract upon termination. The proposal was that plaintiff would be paid for all wire completed in August prior to termination at the rate which was paid during July, that the Government would release to plaintiff any claim to additional buildings and facilities acquired by plaintiff for the performance of the contract and pay allowable expenses incidental to termination, and that plaintiff would relinquish any termination claim, other than expense after termination, it might have against the Government. In addition, plaintiff understood that it was to be awarded a contract for the unwinding of certain wire from Government-owned reels after the termination of the contract, for which it had submitted a proposal. At that time the Government representative took the position that certain buildings, facilities, and equipment which plaintiff had acquired with its own funds had become the property of the Government by reason of their having been amortized during the performance of the contract and it was these items which the proposal provided should be retained by the plaintiff as a part of the so-called no-cost

settlement. As shown from our findings, an exchange of telegrams occurred during the course of the negotiations, in which plaintiff made an offer of settlement under which it agreed to accept payment for completed wire at the rate prevailing for July, and that the buildings and equipment items should become the property of the plaintiff on termination, and defendant replied, accepting the unit price for the wire, but said nothing with respect to the ownership of the buildings and equipment items. In addition, nothing was said in defendant's telegram about the finality of the settlement as affecting the termination of the contract or about the unwinding contract which plaintiff expected to receive. After the receipt of defendant's telegram, a modification of the existing contract under which plaintiff was performing its work was executed, under which it was provided that plaintiff would be paid the same unit price for wire completed during August prior to termination that it had been paid during July, and that otherwise the contract would remain in full force and effect. When it appeared that plaintiff might receive the contract for unwinding wire, it began work thereon but discontinued such work about a week later when no contract was awarded.

We fail to find in these facts any basis for saying that a contract was entered into by the parties which settled all matters in controversy between them relating to the termination of the contract. What happened was that a proposal for a no-cost settlement was discussed, but there was a meeting of minds with respect thereto on only one item therein, namely, the unit price which plaintiff would be paid for the wire which was reclaimed during August prior to the termination of the contract. Plaintiff was not awarded the contract for unwinding wire and no mention was made in the modification of the contract as executed either with respect to plaintiff's facilities, as to which defendant was making claim but offering to release to plaintiff, or as to the finality of the contract. As late as September 4, 1945, some three weeks after the execution of the amendment to the original contract, defendant was still claiming that the buildings and equipment belonged to the Government. In fact, as far as the record shows, the defendant has never ceased claiming that these special facilities and equipment belonged to the Government and in this suit seeks to recover therefor under a counterclaim. We are satisfied that there was no meeting of the minds with respect to a no-cost settlement and that a no-cost settlement was never executed.

■ Defendant's counterclaim arises by reason of the buildings, improvements, and facilities just referred to, which were acquired and paid for by plaintiff at a total cost of $14,782.78 in connection with the performance of its contract. Defendant's position is that these items, along with operating costs, were used in determining the unit prices which plaintiff would be paid under the contract and that therefore at termination they became the property of the Government. As shown from our findings, only the portion of these costs which were incurred during the first period was used in determining any of the unit costs. However, even as to the portion which was used in determining the unit costs, we are convinced that inclusion of the cost of the items in the amount used to determine what was a fair and reasonable unit cost did not thereby make the capital improvements property of the Government. Under the contract, what the defendant was paying plaintiff for was its services in reclaiming wire. In order to perform that service the plaintiff acquired these facilities. In the negotiations between plaintiff and the contracting officer for the unit price for the first contract period, the amount which was expended for these capital items during that period was included along with other costs in order to determine what was a fair and reasonable unit price, and the unit price so determined was paid for the units completed during that period. Apparently the contracting officer recognized the temporary nature of plaintiff's undertaking and desired to permit a speedy amortization of improvements and facilities acquired for

the purpose of the contract. However, there is nothing in the contract that is even suggestive that such a course of action would give title or ownership of these items to the Government in the event of their amortization through the fixation of unit prices under the contract. Plaintiff retained them after termination as it had every right to do and accordingly the counterclaim of the defendant for their residual value is denied.

The final issue in the case is the amount of termination expenses to which plaintiff is entitled. In findings 30, 32, and 33, we have set out termination expenses which we consider allowable in the total amount of $3,217.34. On one of these items, the fee to Hart for the preparation of the termination claim, plaintiff asks for $1,500, whereas we have affirmed the action of the contracting officer in allowing only $35. We have little on which to base a determination as to the value of the services performed by Hart other than the claim itself which he prepared. Apparently a substantial part of the work in connection with its preparation was done by Hanson and by Bookkeeper Dodds for whose services allowance has been made in our termination expenses. When we view the wide variation of the claim as to the cost of work in process, $49,323.67, as compared with that now determined, $3,192.48, and examine the steps taken therein to reach the amount claimed, the question arises in our minds whether Hart did little more than pursue some theoretical computations in its preparation. It is true that the Appeal Board increased the amount allowable for Hart's services from $35 to $750, but an examination of the record before the Appeal Board shows that the nature of Hart's services was not disclosed to the extent set out in the record in this proceeding. We are satisfied that with the allowance of $1,100 to the partners and $390 to the bookkeeper for services after termination, and with an allowance of $35 to Hart, full and adequate compensation is given for services rendered in the preparation

and prosecution of the claim. The claim for a fee of $1,500 on account of the services rendered by an attorney in the prosecution of plaintiff's appeal to the Appeal Board and the traveling expenses and hotel bills in connection with a trip to Washington for the prosecution of the appeal, are not allowable since these were expenses incurred after final determination had been made by the terminating agency. Piggly Wiggly Corporation v. United States, 81 F. Supp. 819, 112 Ct.Cl. 391, and Edelman et al. v. United States, Ct.Cl., 91 F.Supp. 729.

We have heretofore found that the total cost of wire in process at the date of termination was $3,192.48. Under the terms of the contract, in the event of termination plaintiff is entitled to an addition thereto of 6 percent which makes the total allowance for work in process $3,384.03. That amount plus allowable termination expenses of $3,217.34 makes a total of $6,601.37 as the amount to which plaintiff is entitled on account of the termination of the contract. This sum is subject to a credit of $926.59, an amount received by plaintiff on December 12, 1945, in the disposition of wire on hand at termination, which reduces the amount allowable to plaintiff to $5,674.-78. The contracting officer determined that plaintiff was entitled to termination expenses in the total amount of $3,381.62, against which he applied a credit for the amount of $926.59 just referred to, thus showing the net amount due plaintiff as $2,-455.03, and paid to plaintiff 90 percent of that amount, $2,209.53, on March 27, 1946. Judgment will be entered in favor of plaintiff for $3,465.25 ($5,674.78 less $2,209.53) with interest at 2½ percent as provided by section 6(f) of the Contract Settlement Act of 1944 on $5,674.78 from September 6, 1945, to March 27, 1946, and with interest at the same rate on $3,465.25 from March 27, 1946, to December 4, 1946.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.