## LAMAR v. GRANGER.
### Civ. No. 7726.

United States District Court
W. D. Pennsylvania.
July 3, 1951.

18

---

William Wallace Booth, Charles L. Albright, Jr., and Harry R. Birmingham (of Reed, Smith, Shaw & McClay), Pittsburgh, Pa., for plaintiff.

Edward C. Boyle, U. S. Atty., Pittsburgh, Pa., Maurice P. Wolk and Andrew D. Sharpe, Sp. Assts. to Atty. Gen., for defendant.

GOURLEY, Chief Judge.

To simplify references which must be made to various parties, the following abbreviations will be used throughout this Opinion:

| H. H. Lamar | —Taxpayer |
| Stanley Granger, Collector of Internal Revenue | —Collector |
| Kerotest Manufacturing Company | —Kerotest |
| Henry Valve Company | —Henry |
| W. J. Schoenberger Company | —Schoenberger |
| United States of America | —United States |

Action is brought by Taxpayer for refund of alleged overpayment of income taxes for the years 1944, 1945 and 1946 in the principal amount of $27,687.57.

Counsel for the party litigants have been most vigorous, searching and thorough in the trial of this proceeding, and have presented most learned arguments and carefully annotated briefs in support of their respective positions.

Taxpayer is an individual residing at 2504 Hollywood Drive, Wilkinsburg, Pennsylvania. Collector is and has been the duly qualified Collector of Internal Revenue for the 23rd Collection District of Pennsylvania.

Taxpayer kept his books and filed his income tax returns on the calendar year cash basis of accounting. He timely filed his income tax returns for the years 1944, 1945 and 1946, and paid the taxes reported in these returns to Collector.

On October 2, 1947, taxpayer duly filed claims for refund of a portion of the amounts so paid. No action had been taken on these claims.

From 1930 to 1938, Taxpayer was employed as a designing engineer on a salary basis by Kerotest. Thereafter, he was similarly employed by Superior Valve & Fitting Company and by Henry until April 1, 1942.

While working for Kerotest, Taxpayer invented a number of improvements for valves. These were developed on company time, with company facilities, and as an incident to his duties as a designing engineer for Kerotest. Applications for patents on five of these inventions were filed by Taxpayer and coincident with the filing of the applications, he unconditionally assigned to Kerotest his complete interest in the inventions.

Also during the time that he was employed by Kerotest, Taxpayer began working in his spare time on another valve improvement. A completed sketch of this invention was made on April 22, 1938 and an application for a patent was filed on November 8, 1938.

Taxpayer was issued Patent No. 2,217,842, October 15, 1940, and Letters Patent of the Dominion of Canada, No. 405,411, June 16, 1942.

It is this invention and the resulting patent that give rise to the present controversy.

The patent and invention provide:

"The invention relates generally to valves and more particularly to high pressure valves.

"In the operation of the high pressure valves heretofore employed by the trade, difficulty was experienced in actuating the valve head when it was attempted to operate the valve under certain pressure conditions. This resulted in operation failures and made it necessary to obtain a person acquainted with the valve construction and operation to operate it. Consequently, these high pressure valves could not be installed in places where the obtaining of an expert was uneconomical and apt to result in delays.

"The object of the invention is to provide for a substantial balancing of pressures on the valve head disposed in the valve chamber to control the flow of fluids to facilitate the operation of the valve under all pressure conditions.

"It is also an object of the invention to provide for the operation of a valve head without the use of auxiliary equipment and irrespective of the direction of application of the fluid pressures.

"When this valve is connected to a system in which there is a compressor as in a refrigeration system, the check valve func-

tions to protect the diaphragm against pressure surges. This will give the valve a long life.

"The main feature of this invention, as illustrated in all the modifications, is to effect a substantial balance of pressures on the valve head. When this has been accomplished, the means provided for actuating the valve head will function to effect an opening of the valve."

In addition to the general expressions set forth in the patent and its relation to high pressure valves, it is claimed the invention can be applied in sixteen different sets of circumstances.

Reduced to simple phraseology, the sixteen claims in the invention have four uses in the industrial or scientific field of mechanics:

(a) Refrigeration

(b) High pressure fluid containers

(c) Airplanes or aviation fields

(d) General application or usages

Various agreements were entered into by Taxpayer with Henry and Schoenberger. Each standing alone is somewhat confusing, and to ascertain the intention of the parties relative to said patent, all the instruments, each referring to the other, must be construed together.

On December 9, 1939, Taxpayer and Henry entered into an agreement wherein Taxpayer granted to Henry an exclusive license to manufacture, use, and sell valves embodying the Taxpayer's invention for a stipulated royalty of 5% of the net selling price of the valves, with guaranteed minimum royalties of $1,500 per year.[1]

1. "Memorandum of Agreement
"This agreement made and entered into this 9th day of December, 1939, by and between Harry H. Lamar, of Pittsburgh, Pennsylvania, hereinafter referred to as 'Lamar', and Henry Valve Company, a corporation of the State of Illinois, having its office and principal place of business at Chicago, Illinois, hereinafter referred to as 'The Company,' witnesseth:
"Whereas, Lamar has invented certain new and useful improvements in valves, and has made application for patent in the United States on said improvements, which application was filed on November 8, 1938 under Serial No. 239,527; and

warrants that he is the owner of all rights under said inventions; and
"Whereas, The Company is desirous of acquiring an exclusive license to manufacture and sell valves embodying said improvements, providing adequate patent protection can be obtained on the same; Now, Therefore, To All Whom It May Concern:
"Be It Known that for and in consideration of the premises and the mutual covenants and agreements hereinafter stated, the parties have agreed and hereby agree as follows:
"1. Lamar hereby grants unto The Company an exclusive license under said

On August 6, 1942 and January 15, 1943, contracts supplementing the December 9, 1939 indenture were entered into between the parties.

inventions, and under any and all patents which may issue on said application or for said inventions, to manufacture, use and sell valves embodying said inventions, throughout the United States and all foreign countries.

"2. The Company agrees to pay to Lamar a royalty amounting to five per cent (5%) of The Company's net selling prices for said valves.

"3. The Company agrees to pay to Lamar, as a minimum on account of said royalties, not less than the sum of Fifteen Hundred Dollars ($1500.00) each calendar year that this agreement remains in force, payable at the end of each calendar year, and commencing with the calendar year 1940.

"4. The Company agrees to keep accurate records pertaining to the manufacture and sale of the valves covered by this license; agrees to furnish Lamar reports (verified if requested) at the end of each quarter, between the first and fifteenth days of April, July, October and January, covering the number of said licensed valves sold or put into use during the preceding quarter and the net prices received by The Company for said valves; and agrees to accompany each such report with a remittance covering the royalties shown to be due thereby.

"5. In the event The Company finds it necessary or to its advantage to sublicense one or more users of valves under said inventions The Company may grant sub-licenses to users of valves, at a royalty of not less than five per cent (5%), limited to valves supplied with or for use with refrigeration equipment sold by said users, and The Company agrees to pay to Lamar one-half of the royalties received by The Company from said users on the latter's production.

"6. Lamar may terminate this agreement at any time in the event The Company fails to pay the royalties herein provided for, by serving The Company with sixty (60) days advance notice in writing of his intention to cancel and the reasons therefor, but The Company may prevent such termination and continue the license in full force and effect by making such payments within said sixty day period. The Company may relinquish this license at the end of the calendar year 1946, or at the end of the calendar year 1951, or at the end of any calendar year after 1951, by serving Lamar with six (6) months advance notice in writing (registered mail) of its intention to relinquish. Upon relinquishment of the license by The Company the latter agrees that it will immediately discontinue the manufacture of the herein licensed valves and within one year conclude the sale of any of said valves then on hand, unless the relinquishment takes place because of the apparent invalidity of the patent or patents covering said valves.

"7. Lamar agrees to keep The Company fully advised as to the progress being made in obtaining patent protection on said improvements.

"8. In the event the valve shown in the blue print marked 'Exhibit A' attached hereto, or any other valve designed by Lamar for The Company and incorporating the herein licensed invention, is ever held by a court of competent jurisdiction to be an infringement of any patent or patents owned by others, The Company may forthwith relinquish this license and terminate all its obligations hereunder. During the pendency of any such litigation The Company shall not be required to pay over to Lamar the minimum or earned royalties prescribed herein, but shall place such payments in escrow, to be turned over to Lamar at the conclusion of the litigation if no infringement be found, and to be returned to The Company if and when infringement be found and such decision finding infringement becomes final.

"9. This license shall include, at The Company's option, during the continuance of the license, any and all improvements on the herein licensed valve structure made or acquired by Lamar during the term of this agreement and all extensions thereof.

"10. In the event of infringement of the herein licensed patent rights by others The Company shall have the right to enforce said patent rights. The expenses of any such litigation shall be borne by The Company, and The Company shall be entitled to any recovery on account of infringement.

"11. In the event The Company should ever be adjudged a bankrupt, this license shall immediately terminate and all rights under the herein licensed inventions shall thereupon revert to Lamar.

"12. Lamar has invented another valve, shown in the drawing attached hereto and marked 'Exhibit B', on which invention he is about to file a separate application for patent. It is agreed between the parties hereto that the invention illustrated in 'Exhibit B' shall be

Under the August 6, 1942 supplement, Henry gave Taxpayer "the right to license others to make, use and sell and have made" valves embodying the patent: (1) for so-called high-pressure uses, not including, however, the right to make line valves, which is a shut-off valve; and (2) for use in aircraft. Under other provisions of the agreement Henry also reserved for itself a non-exclusive license to use the patent in making valves for high-pressure and aircraft uses after January 1, 1947, or sooner under certain conditions.[2]

included in this license. In consideration of this inclusion. The Company agrees to pay the cost of preparing said second "application and the cost of prosecuting the same, and agrees to pay a royalty of five per cent (5%) of the net selling price on all valves which it sells embodying the invention covered by any patent which may issue on said second application, the royalty payments to be made in accordance with the provisions of Paragraph 4 of this agreement. The license to The Company under said second application shall be exclusive, may be relinquished by The Company at any time, and shall not in any event continue in force after the termination of the license under application Serial No. 239,527. In no event shall The Company be required to pay a royalty of more than five per cent (5%) on any valve by reason of the fact that it may incorporate features disclosed in application Serial No. 239,527 and also features disclosed in said second application.

"13. This agreement shall inure to the benefit of and be binding upon the heirs, legal representatives and assigns of Lamar.

"In Witness Whereof the parties hereto have executed this agreement, in duplicate."

2.          "Supplemental Agreement

"This agreement made and entered into this 6th day of August, 1942, by and between Harry H. Lamar of 202 South Cuyler Avenue, Oak Park, Illinois (hereinafter called Lamar) and the Henry Valve Company, a corporation of the State of Illinois, having its office and principal place of business at Chicago, Illinois (hereinafter called Company).

"Witnesseth:

"Whereas, Lamar and the Company are now operating under a license agreement entered into the 9th day of December, 1939, granting the Company an exclusive license under Letters Patent No. 2,217,842 issued to Lamar October 15, 1940, relating to Valve Structures, which license provides that the Company may terminate the license agreement at the end of the calendar year 1946, or at the end of the calendar year 1951, or at the end of any calendar year thereafter;

"Whereas, the Company has decided that it will not in the immediate future make, use and sell valves covered by the aforesaid patent (1) for containers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers, but not including line valves of the same general type as the Company is now making under the aforesaid patent, and (2) for equipment and mechanisms for incorporation in airplanes of all kinds and airships which are lighter than air.

"Whereas, Lamar is desirous of exploiting his patent to the fullest extent by obtaining licensees who will make, use and sell valves covered by the aforesaid patent (1) for containers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers, but not including line valves of the same general type as the Company is now making under the aforesaid patent, and (2) for equipment and mechanisms for incorporation in airplanes of all kinds and airships which are lighter than air.

"Now, Therefore, for and in consideration of the payment by Lamar of One Dollar ($1.00) and other valuable considerations, the receipt and sufficiency of which are hereby acknowledged by the Company, and for and in consideration of the premises and covenants hereinafter set forth and to be faithfully performed, Lamar and the Company agree as follows:

"Article I—Grant And Release

"(a) The Company hereby grants and releases to Lamar the right to license others to make, use and sell and have made valves, under the aforesaid patent, (1) for containers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers, but not including line valves of the same general type as the Company is now making under the aforesaid patent, and (2) for equipment and mechanisms

The supplement of January 15, 1943, while substantially duplicating the August 6, 1942 contract, made two important changes: Henry relinquished its previously

for incorporation in airplanes of all kinds and airships which are lighter than air.

"(b) The Company hereby agrees that it will not make, use or sell prior to December 31, 1946, except on conditions hereinafter provided, valves covered by the aforesaid patent, (1) for containers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers, but not including line valves of the same general type as the Company is now making under the aforesaid patent, and (2) for equipment and mechanisms for incorporation in airplanes of all kinds and airships which are lighter than air.

"(c) The Company hereby reserves to itself, effective after January 1, 1947, a non-exclusive, indivisible and non-assignable license to make, use and sell valves (1) for containers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers, and (2) for equipment and mechanisms for incorporation in airplanes of all kinds and airships which are lighter than air, under the terms and conditions provided in the agreement dated December 9, 1939, as modified under the provisions provided herein.

"(d) Nothing herein shall be construed as at any time preventing the Company from manufacturing, using or selling line valves for any purpose of the same general type as the Company is now making under the aforesaid patent, and nothing herein shall be construed as releasing to Lamar the right to license others to manufacture, use and sell line valves of the same general type as the Company is now making under the aforesaid patent, excepting, however, line valves for the above defined airplane field.

"Article II—More Favorable Terms

"Lamar agrees that in case he shall, during the life of this agreement, grant to a third party a license under the aforesaid Letters Patent to make, use and sell valves at a lower royalty rate than that provided for in the agreement dated December 9, 1939, Lamar shall, within thirty (30) days, give written notice (verified if requested) to the Company of the granting of such license, together with a copy of the license, and any subsequent changes therein, and the Company shall be entitled to have the benefit of the same royalty rate as may at any time be accorded to such third party.

"Article III—Effect of Licenses To Others

"Lamar hereby agrees that if during the term of this agreement he shall grant a non-exclusive license to another to make, use and sell valves under the aforesaid patent then he shall, within thirty (30) days, give written notice (verified if requested) to the Company of the granting of such license and of the scope of the grant, together with a copy of the license, and any subsequent changes therein; and the non-exclusive license reserved by the Company in paragraph (c) of Article I hereof shall forthwith become effective to the extent of the scope of the non-exclusive license grant to such other notwithstanding the restrictions of paragraph (b) of Article I hereof.

"Article IV—Conditions To Release

"It is further hereby agreed by and between the parties hereto that Lamar shall have until the end of the calendar year 1944 to find one or more bona fide licensees under the aforesaid patent; and if Lamar grants a license under the aforesaid patent in either of the two fields enumerated in and covered by the release of paragraph (a) of Article I hereof, he shall within thirty (30) days after the granting of such license give written notice (verified if requested) to the Company of the name of the licensee and the date of the license, and shall furnish the Company with a copy of said license, and any subsequent changes therein, otherwise said license shall be null and void; and if Lamar fails to find a bona fide licensee in either or both of said fields before the end of the calendar year 1944, then the Company shall no longer be bound by the provisions of paragraph (b) of Article I hereof with respect to the field or fields in which Lamar has not found a bona fide licensee and the Company shall thereupon and thereafter again have the exclusive right to make, use and sell valves under the aforesaid patent for all purposes in connection with such field or fields.

"Article V—Termination

"Failure of Lamar to fully and faithfully comply with any of the conditions of this agreement, within the times specified for the performance or observance thereof, with respect to the granting of

reserved non-exclusive license to make valves for high pressure and aircraft uses; and Taxpayer agreed to pay Henry Valve Company $1,000 within sixty days after he granted exclusive licenses to others to use the patent.

The sections of the supplement of January 15, 1943 which differ from the supplement of August 6, 1942 are set forth in footnote three.[3]

licenses to others and written notification to the Company in connection with the same, shall forthwith automatically vitiate this supplementary agreement, in its entirety.

"This agreement and the covenants herein contained shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto.

"In Witness Whereof, the parties hereto have executed this agreement in duplicate."

3. "Whereas, Lamar and the Company are now operating under a license agreement, entered into the 9th day of December, 1939, granting the Company an exclusive license under United States Letters Patent No. 2,217,842 issued to Lamar October 15, 1940, and Letters Patent of the Dominion of Canada 405,411 issued June 16, 1942, relating to Valve Structures, which license provides that the Company may terminate the license agreement at the end of the calendar year 1946, or at the end of the calendar year 1951, or at the end of any calendar year thereafter: and a supplemental agreement of the 6th day of August, 1942, granting and releasing to Lamar the right to grant exclusive licenses in certain fields.

"Article I—Grant and Release

"(b) The Company hereby agrees that it will not make, use or sell under the license grant of the 9th day of December, 1939, valves (1) for containers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers, and (2) for equipment and mechanisms for incorporation in airplanes of all kinds and airships which are lighter than air.

"(c) Lamar hereby agrees that he will pay to, or cause to be paid to, the Company the sum of One Thousand Dollars ($1,000.00) within sixty (60) days after granting a license to another to make, use and sell or have made valves in each of the following fields: (1) for con-

The first and second supplemental agreements between Taxpayer and Henry provided that any license of Taxpayer which related to the high-pressure or aviation field would be subject to the right of Henry to an indivisible, non-exclusive and non-assignable license from the licensee or assignee of Taxpayer in the fields of such a license grant to become effective as of January 1, 1947, and at the same royalty

tainers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers, and (2) for equipment and mechanisms for incorporation in airplanes of all kinds and airships which are lighter than air.

"(d) Lamar further agrees that in granting a license in each of said fields to another, he shall provide that such other licensee shall be obliged to grant to the Company if it so desires an indivisible, non-exclusive and non-assignable license in the field of such license grant, the license grant to the Company to become effective as of January 1, 1947, and at the same royalty rate as such license grant from Lamar to the new licensor of the Company.

Article III—Effect Of Licenses To Others

"Lamar hereby agrees that if during the term of this agreement he shall grant a non-exclusive license to another to make, use and sell valves under the aforesaid patent then he shall, within thirty (30) days, give written notice (verified if requested) to the Company of the granting of such license and of the scope of the grant, together with a copy of the license, and any subsequent changes therein; and the terms of paragraph (b) of Article I hereof shall forthwith become ineffective to the extent of the scope of the non-exclusive license grant to such other and the Company shall again have the right to make, use and sell valves under the aforesaid patents on the terms of the original grant of the 9th day of December, 1939, or those provided for in Article II hereof.

"Article V—First Supplemental Agreement

"This second supplemental agreement which embodies many of the terms and conditions of the first supplemental agreement of the 6th day of August, 1942, shall when signed by the parties hereto supersede the first supplemental

rate as such license grant from Taxpayer to the new licensee.

Subsequently, Taxpayer entered into an agreement with Schoenberger wherein Taxpayer granted to Schoenberger a non-assignable, exclusive license under the aforesaid patent to make, use and sell, and have made valve containers for certain high-pressure fluids, *but not including line valves of the same general type being made by Henry* and for equipment and mechanisms for incorporation in airplanes of all kinds and airships which are lighter than air. The original agreement and two supplemental agreements between Taxpayer and Henry were incorporated and made a part of said agreement.[4]

agreement and shall in conjunction with the license agreement of October 15, 1940, constitute the full agreement between the parties."

4. "Agreement entered into this 15th day of April, 1943, by and between Harry H. Lamar, a citizen of the United States of America, residing at 2504 Hollywood Drive, Wilkinsburg, Pennsylvania, (hereinafter called Lamar) and the W. J. Schoenberger Company, a corporation of the State of Ohio, having its office and principal place of business at 8810 Harvard Avenue, Cleveland, Ohio (hereinafter called Schoenberger).

"Witnesseth:

"Whereas, Lamar is the owner of United States Letters Patent No. 2,217,842, issued October 15, 1940, and Letters Patent of the Dominion of Canada No. 405,411, issued June 16, 1942, relating to Valves; under which patents on December 9, 1939, he granted an exclusive license to Henry Valve Company, a corporation of the State of Illinois, having a place of business at Chicago, Illinois; said exclusive license agreement having been modified on August 6, 1942, releasing to Lamar the right to license others under said patents to make, use and sell, and have made, 'valves for containers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers' and further modified on the 15th day of January, 1943, by a second supplemental agreement which supersedes the supplemental agreement of August 6, 1942, releasing to Lamar additional rights and which said second supplemental agreement together with the agreement of December 9, 1939, constitute the present agreement between Henry Valve Company and Lamar. A copy of the license agreement dated December 9, 1939, is attached hereto as Exhibit I; a copy of the first supplemental agreement dated August 6, 1942, is attached hereto as Exhibit II; a copy of the second supplemental agreement of January 15, 1943, is attached hereto as Exhibit III; and a catalog issued by the Henry Valve Company is attached hereto as Exhibit IV.

"Whereas, Schoenberger is desirous of acquiring an exclusive license under the aforesaid patents as hereinafter set forth.

"Now, Therefore, for and in consideration of the premises and the covenants hereinafter recited and to be faithfully performed, and other good and valuable consideration, it is understood and agreed as follows:

"Article I—Definitions

"(a) For the purpose of this agreement, subsidiaries are corporations, a majority of whose stock having power to vote for the election of directors is owned, directly or indirectly, either by Schoenberger, or by Schoenberger and one or more of its subsidiaries.

"(b) Valves for the purpose of determining royalties shall mean complete valve assemblies and spare parts.

"Article II—Grant

"(a) Lamar hereby grants to Schoenberger and its subsidiaries a non-assignable, exclusive license under the aforesaid patent to make, use and sell, and have made, valves for containers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers, but not including line valves of the same general type as the Henry Valve Company is now making under the aforesaid patent on terms as set forth hereinafter.

"(b) No license is herein granted, either expressly or otherwise, under any Letters Patent of any foreign country or under any United States Letters Patent other than the aforesaid Letters Patent No. 2,217,842 and 405,411 or outside the scope of the license grant of paragraph (a) of this Article II.

"Article III—Royalties And Reports

"(a) Schoenberger covenants to pay on the consummation of this agreement One Thousand Dollars ($1,000.00) to Lamar or anyone designated by Lamar to re-

It appears that Henry was of the belief that the reservation of the rights in these two fields was not set forth with sufficient clarity in the supplemental agreements between Henry and Taxpayer.

Therefore, after Taxpayer licensed Schoenberger, Henry requested Schoenberger to unequivocally set forth said rights by written agreement in the high-pressure aviation fields.

ceive said One Thousand Dollars ($1,000.00) and royalties to Lamar at the following rates, on the net sales price of protected valves manufactured, sold or put into use by Schoenberger, its subsidiaries, or its sub-licensee; five per cent (5%) on the first $500,000.00 of such sales, four per cent (4%) on the next $250,000.00 of such sales, and three per cent (3%) on all over $750,000.00 of such sales, each year.

"(b) The royalties shall be computed quarterly and within thirty (30) days after the first days of January, April, July and October of each calendar year during the continuance of this agreement, Schoenberger shall furnish Lamar with a written statement, verified if Lamar shall so request, of all licensed valves coming within the terms of this agreement and sold or put into use by Schoenberger during the then next preceding calendar quarterly period, and the prices at which they were sold or put into use, clearly indicating whether the licensed valves have been made by Schoenberger or for Schoenberger by another (and where by another, stating by whom made and quantities made by such other), and in such additional detail as to enable the royalties payable hereunder to be computed, except that the first such report shall include the number and description of licensed valves used or sold by Schoenberger between the effective date of this agreement and the date of such report. Schoenberger shall, at the time of rendering said statement, or within fifteen (15) days thereafter, pay to Lamar, or someone designated by Lamar, the amount of royalty shown to be due by such statement. If, during any quarterly period, no licensed valves coming within the terms of this agreement shall have been sold or put into use by Schoenberger, a statement to this effect shall be rendered in the same manner as if sales had been made.

"(c) Licensed valves shall be considered to be sold when billed out, or, if not billed out, then when delivered, or when paid for if paid for before delivery; but royalties paid on licensed valves not accepted by the customer shall be credited against future royalty payments to be made hereunder.

"(d)) Schoenberger hereby agrees to pay Lamar as a minimum on account of said royalties not less than the sum of Fifteen Hundred Dollars ($1500.00) each calendar year that this agreement remains in force, payable at the end of each calendar year and commencing on the date that Schoenberger begins the manufacture of valves covered by said Letters Patent provided manufacture of such valves is started within six (6) months after the date of this agreement but if Schoenberger has not started the manufacture of such valves before the expiration of six (6) months after the date of this agreement then the minimum royalties shall commence at the end of six (6) months after the date of this agreement and such minimum royalty shall be prorated if this license is in effect for only a portion of the calendar year during which the minimum royalty commences accruing to Lamar or in which the license is terminated either by act of the parties in the manner provided for herein or upon the expiration of the patents.

"Article IV—Records

"(a) Schoenberger shall keep proper records with respect to all licensed valves which it may make (or have made for it in whole or in part) and sell, or which are put into use under the license herein granted, in sufficient detail to show the operations of Schoenberger hereunder and to afford the proper basis for the royalty payments and reports required hereunder.

"(b) Schoenberger shall also permit Lamar, through an auditor acceptable to Schoenberger, or a certified public accountant, to inspect, during the ordinary business hours, the foregoing records and to make abstracts therefrom, at reasonable times. In no case shall such abstracts include the names of customers.

"(c) Schoenberger shall require its licensees to make written quarterly statements of all licensed valves coming within the terms of this agreement and sold or put into use, in such detail as to enable royalties payable to be computed, such quarterly statements to be made within thirty (30) days after the first days of January, April, July and October of each calendar year and Schoenberger shall submit copies of such statements to Lamar.

Said request resulted in an agreement of April 20, 1943 between Schoenberger and Henry, which granted to Henry a non-exclusive, indivisible and non-assignable

## "Article V—Restrictions

"It is understood and agreed that Schoenberger is not licensed under this agreement to dispose of licensed valves covered by said Letters Patent to others except by sale.

## "Article VI—Validity

"The admission of validity of said Letters Patent, implied by the acceptance of this license, is limited to the term and scope of the license herein granted.

## "Article VII—Arbitration

"In the event that either of the parties hereto by notice in writing to the other calls for an arbitration with respect to any matter in dispute arising between them and growing out of this agreement, as to which matter or conflict an award by arbitrators final and binding upon the parties and enforceable in a court of law can be made, each party shall within thirty (30) days from said written notice select an arbitrator and the two arbitrators shall select a third arbitrator. In the event that the two arbitrators shall fail to select a third, or in the event either party fails to select its arbitrator, it is agreed that such additional arbitrator or arbitrators may be selected by a district judge of the United States District Court of the Western District of Pennsylvania. The three arbitrators thus selected shall constitute the Board of Arbitration and the parties hereto shall submit their contention to this Board of Arbitrators at a time and in a manner determined by the arbitrators. Any arbitrators to be so selected shall be pledged to hear the complainant's case within sixty (60) days from the date of appointment, and the opposer's case within the next thirty (30) days, and the complainant's rebuttal within the next thirty (30) days, and to render its decision within the next sixty (60) days, subject to the arbitrator's right to extend or shorten such time, according to the mutual agreement of the parties. The decision of any two arbitrators expressed in writing and signed by them shall be final and binding on the parties hereto. The expense of arbitration shall be borne by the losing party, or apportioned as the arbitrators may direct.

## "Article VIII—Marking

"Schoenberger agrees that it will mark licensed valves sold or put into use under this license with the word 'patent,' followed by the number of said Letters Patent which applies in the country in which the valve is manufactured, and that it will comply with any other reasonable requirements with respect to patent marking made from time to time by Lamar.

## "Article IX—Term And Termination

"(a) This agreement, unless sooner terminated in accordance with the terms hereof, shall extend for the full life of the Letters Patent under which this license is granted.

"(b) Schoenberger shall have the right to terminate this license at the end of the calendar year 1950, or at the end of the calendar year 1955, or at the end of any calendar year thereafter by serving Lamar with six (6) months' advance notice in the manner provided for in Article X of this agreement.

"(c) In the event that Schoenberger at any time fails to make the quarterly statements, or fails to pay the royalty in the manner hereinbefore provided, or otherwise fails to comply with the provisions of this agreement, Lamar shall have the option of treating this agreement as in full force and effect and taking proper steps to recover royalties payable hereunder or of canceling this license and agreement provided, however, that in case Lamar elects to cancel this agreement he shall first mail or otherwise send to Schoenberger a written notice of his intention, together with a statement as to the grounds upon which the intended action is based. If, within thirty (30) days after the receipt of such notice, Schoenberger shall have met the objections presented by Lamar and shall have complied with the provisions of this agreement, then the notice shall become null and void and of no effect, but otherwise the notice shall remain effective and the license and agreement shall cease and terminate at the expiration of thirty (30) days last mentioned above.

"If Schoenberger shall become insolvent, or if any petition in bankruptcy shall be filed by or against it, or if a receiver or trustee shall be appointed for any part or all of its properties, then this agreement and all licenses and rights granted to Schoenberger hereunder may be terminated by Lamar by five (5) days' written notice of his intention to terminate the same herein.

"(d) No cancellation or termination as provided for in this agreement shall release Schoenberger of its liability for any royalties that may have accrued prior to such cancellation or termination, respectively.

license under the Letters Patent in the high-pressure field after January 1, 1947.[5]

I do not believe this Agreement was necessary since Henry already had a joint right of use in said fields with Taxpayer or his assignee.

The request further resulted in an agreement of June 10, 1943 between Schoen-

"(e) Schoenberger further agrees that if during the calendar year of 1946 or any calendar year thereafter during the continuance of this agreement royalties paid by Schoenberger do not amount to the sum of Five Thousand Dollars ($5,000.00) then Lamar shall be entitled if he so elects to convert this exclusive license to a non-exclusive license by giving written notice to Schoenberger within sixty (60) days after the close of such calendar year and to grant non-exclusive licenses to others to make, use and sell, and have made, under the aforesaid patent, valves for containers for butane, propane and other fluids stored under pressure and for loading such containers and for dispensing such fluids from such containers.

"(f) If Lamar elects to convert the exclusive license granted herein to a non-exclusive license under the provisions of paragraph (e) of this Article IX and later grants a license to another in the field of the license granted herein and such license to another is on more favorable royalty terms than those provided for herein, then such more favorable royalty terms shall be extended to Schoenberger from the date of such license grant to such another in the field of the license granted herein and Lamar shall be obligated to notify Schoenberger within sixty (60) days of the date of such license grant to such another.

"Article X—Notices

"All notices required or provided for in this agreement shall be in writing and served by delivering the same to an executive officer of Schoenberger or to Lamar, or by mailing the same registered United States mail addressed, respectively, to Schoenberger at Cleveland, Ohio, and to Lamar at 2504 Hollywood Drive, Wilkinsburg, Pennsylvania, or such other persons or addresses as the parties may respectively designate in writing.

"Article XI—Constructions Of Patents

"If, in any proceeding in which the validity, infringement or priority of invention or any claim of the said Letters Patent is in issue, a judgment or decree is entered which becomes not further reviewable through the exhaustion of all permissible applications for rehearing or review by a superior tribunal, or through the expiration of the time permitted for such application (hereinafter referred to as an 'irrevocable judgment'), the construction placed upon any such claim by such irrevocable judgment shall be thereafter followed not only as to such claim, but to all claims to which such construction applies, with respect to acts occurring thereafter; and, if such irrevocable judgment holds any claim invalid or is adverse to the patent as to inventorship, Schoenberger shall be relieved thereafter from including in its reports hereunder licensed products sold thereafter covered only by such claim or by any broader claim to which such irrevocable judgment is applicable, and from the performance of those other acts which may be required by this agreement only because of such claim; provided, however, that if there are two or more conflicting irrevocable judgments with respect to the same claim, the decision of the higher tribunal shall be followed thereafter, but if the tribunals be of equal dignity, then the decision more favorable to the claim shall be followed until the less favorable decision has been followed by the irrevocable judgment of another tribunal of at least equal dignity.

"Article XII—Infringement

"In the event of infringement of the herein licensed patent rights by others in the manufacture, use and sale of valves for containers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers, Schoenberger shall have the right to enforce said patent rights. The expense of any such litigation shall be borne by Schoenberger and Schoenberger shall be entitled to any recovery on account of such infringement.

"Article XIII—Successors And Assigns

"This agreement and the covenants herein contained, except otherwise as expressly provided, shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

"In Witness Whereof, Harry H. Lamar and the Schoenberger Company have respectively caused these presents to be signed, the W. J. Schoenberger Company by their proper officers thereunto duly authorized."

"Memorandum Of Agreement

"This agreement made and entered into this 20th day of April, 1943, to become effective January 1, 1947, by and between

the W. J. Schoenberger Company, a corporation of the State of Ohio, having an office at Cleveland, Ohio (hereinafter called Schoenberger) and the Henry Valve Company, a corporation of the State of Illinois, having its office and principal place of business at Chicago, Illinois, (hereinafter called Henry).

"Witnesseth:

"Whereas, Schoenberger has an exclusive license under United States Letters Patent No. 2,217,842, issued to Harry H. Lamar October 15, 1940, and Letters Patent of the Dominion of Canada No. 405,411, issued June 16, 1942, relating to Valves, said license being exclusive in the field of valves for containers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers.

"Whereas, Henry wants to be free to engage in the manufacture of valves for containers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers after January 1, 1947, and therefore is desirous of acquiring a nonexclusive, indivisible license to manufacture and sell valves embodying the features of said patent in such field;

"How, Therefore, for and in consideration of the payment by Henry of One Dollar ($1.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Schoenberger, and for and in consideration of the premises and covenants hereinafter set forth and to be faithfully performed, Schoenberger and Henry agree as follows:

"Article I—Grant

"Schoenberger hereby grants to Henry a nonexclusive, indivisible, nonassignable license under the aforesaid Letters Patent to make, use and sell valves embodying the features of said invention throughout the United States and Canada and other countries in which corresponding patents may be obtained for containers for butane, propane and other fluids that may be stored under pressure and for loading such containers and for dispensing such fluids from such containers.

"Article II—Royalties And Reports

"(a) Henry covenants to pay royalties to Schoenberger at the following rate, on the net sales price, five per cent (5%) on the first $500,000.00 of such sales, four per cent (4%) on the next $250,-000.00 of such sales, and three per cent (3%) on all over $750,000.00 of such sales, each year, embodying the invention covered by said Letters Patent and falling within the scope of the license granted in Article I hereof.

"(b) The royalties shall be computed quarterly and within thirty (30) days after the first days of January, April, July and October of each calendar year during the continuance of this agreement, Henry shall furnish Schoenberger with a written statement, verified if Schoenberger shall so request, of all licensed valves coming within the terms of this agreement and sold or put into use by Henry during the then next preceding calendar quarterly period, and the prices at which they were sold or put into use, and in such detail as to enable the royalties payable hereunder to be computed, except that the first such report shall include the number and description of licensed valves used or sold by Henry between the effective date of this agreement and the date of such report. Henry shall, at the time of rendering said statement, or within fifteen (15) days thereafter, pay to Schoenberger, or someone designated by Schoenberger, the amount of royalty shown to be due by such statement. If, during any quarterly period, no licensed valves coming within the terms of this agreement shall have been sold or put into use by Henry, a statement to this effect shall be rendered in the same manner as if sales had been made.

"(c) Valves shall be considered sold or put into use when billed out, or if not billed out, then when delivered or put into use, or when paid for if paid for before delivery; but royalties paid on such valves lost or damaged in transit for which the licensee is not reimbursed by insurance payments, or valves not accepted by the customer, or returned by the customer for credit shall be credited on future royalty payments.

"Article III—Minimum Sales Price

"The license herein granted is subject to the express limitation that if and when after January 1, 1947, Schoenberger shall serve on Henry a schedule of the minimum net prices which Schoenberger is then observing for the sale of any particular protected valve falling within the scope of the license grant of Article I hereof, Henry shall commencing ninety (90) days after such service refrain from selling or offering for sale the herein licensed valves at prices less than said minimums and Schoenberger shall do likewise, and neither Henry nor Schoenberger in connection with any negotiations for the sale of said valves shall offer directly or indirectly to a customer any other merchandise at less than going prices or any other condition, the effect

of which might be for either party to sell licensed valves at any prices less than those established by Schoenberger and communicated to Henry. Should either Henry or Schoenberger sell any of said valves within the field covered by this license at a net price which is less than the minimum price established by Schoenberger for the sale of valves of the same size, or otherwise violate the terms of this article, the party making the offending sale or sales shall upon all the available facts being called to its attention by written notice from the other party immediately discontinue such practice and pay to the other party as liquidated damages its entire profits on the offending sale or sales, or an amount equal to ten per cent (10%) of the total amount of said sale or sales, whichever is greater, and until such payment is received by the other party the latter shall not be obligated to observe the prescribed minimums. Schoenberger may permanently abolish the minimum price features of this license at any time upon giving Henry ninety (90) days' advance notice of the same. Henry shall be relieved from observing the minimum price features of this license should Schoenberger make more than two sales in any one calendar year at prices below the prescribed minimums. By the term 'net price' as used herein is meant the price which the customer is actually required to pay after deduction of the usual trade discounts. The purpose of this provision is to prevent either party from underselling the other. It is further provided that after the effective date of this license agreement when Schoenberger has established minimum prices for valves under this license, it will not change such established prices, unless labor and material costs entering into the cost of manufacture and sale of the valve shall increase or decrease in excess of ten per cent (10%), unless Schoenberger shall first obtain the consent of Henry.

"Article IV—Construction Of Patents

"If, in any proceeding in which the validity, infringement or priority of invention of any claim of the said Letters Patent is in issue, a judgment or decree is entered which becomes not further reviewable through the exhaustion of all permissible applications for rehearing or review by a superior tribunal, or through the expiration of the time permitted for such application (hereinafter referred to as an 'irrevocable judgment'), the construction placed upon any such claim by such irrevocable judgment shall be thereafter followed not only as to such claim, but to all claims to which such construction applies, with respect to acts occurring thereafter; and, if such irrevocable judgment holds any claim invalid or is adverse to the patent as to inventorship, Henry shall be relieved thereafter from including in its reports hereunder licensed products sold thereafter covered only by such claim or by any broader claim to which such irrevocable judgment is applicable, and from the performance of those other acts which may be required by this agreement only because of such claim; provided, however, that if there are two or more conflicting irrevocable judgments with respect to the same claim, the decision of the higher tribunal shall be followed thereafter, but if the tribunals be of equal dignity, then the decision more favorable to the claim shall be followed until the less favorable decision has been followed by the irrevocable judgment of another tribunal of at least equal dignity.

"Article V—Term And Termination

"(a) This agreement, unless sooner terminated, shall extend for the full life of the Letters Patent under which this license is granted.

"(b) In the event that Henry at any time fails to make the quarterly statements, or fails to pay the royalty in the manner hereinbefore provided, or otherwise fails to comply with the provisions of this agreement, Schoenberger shall have the option of treating this agreement as in full force and effect and taking proper steps to recover royalties payable hereunder, or of canceling this license and agreement provided, however, that in case Schoenberger elects to cancel this agreement he shall first mail or otherwise send to Henry a written notice of his intention, together with a statement as to the grounds upon which the intended action is based. If, within thirty (30) days after the receipt of such notice, Henry shall have met the objections presented by Schoenberger and shall have complied with the provisions of this agreement, then the notice shall become null and void and of no effect, but otherwise the notice shall remain effective and the license and agreement shall cease and terminate at the expiration of thirty (30) days last mentioned above.

"(c) If Henry shall become insolvent, or if any petition in bankruptcy shall be filed by or against it, or if a receiver or trustee shall be appointed for any part or all of its properties, then this agreement and all licenses and rights granted to Henry hereunder may be terminated by Schoenberger by five (5) days' written notice of his intention to terminate the same herein.

berger and Henry which granted to Henry a non-exclusive, indivisible, non-assignable license under the Letters Patent in

"(d) No cancellation or termination as provided for in this agreement shall release Henry of its liability for any royalties that may have accrued prior to such cancellation or termination, respectively.

"Article VI—Patent Marking

"Henry agrees that it will mark licensed valves sold or put into use under this license with the word 'Patent,' followed by the number of said Letters Patent, and that it will comply with any other reasonable requirements with respect to patent marking made from time to time by Schoenberger.

"Article VII—Engineering Service

"After January 1, 1947, Schoenberger upon request from Henry Valve Company shall make available to the Henry Valve Company engineering information on valves falling within the scope of this license which Schoenberger may be manufacturing and should the Henry Valve Company require engineering service to interpret such engineering information supplied by Schoenberger, such service will be supplied by Schoenberger from time to time at the rate of Twenty-five Dollars ($25.00) per day per man plus traveling and living expenses. It is further understood and agreed that Schoenberger shall not be required to provide more than one man at one time under the provisions of this paragraph.

"Article VIII—Successors And Assigns

"This agreement and the covenants herein contained, except as otherwise expressly provided, shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

"In Witness Whereof, the W. J. Schoenberger Company and the Henry Valve Company have respectively caused these presents to be signed by their proper officers thereunto duly authorized."

6. "Memorandum Of Agreement

"This agreement made and entered into this 10th day of June, 1943, to become effective January 1, 1947, by and between the W. J. Schoenberger Company, a corporation of the State of Ohio, having an office at 8810 Harvard Avenue, Cleveland, Ohio, (hereinafter called Schoenberger) and the Henry Valve Company, a corporation of the State of Illinois, having its office and principal place of business at Chicago, Illinois (hereinafter called Henry).

"Witnesseth:

equipment and mechanisms for incorporation in airplanes of all kinds and airships which are lighter than air.[6]

"Whereas, Schoenberger has an exclusive license under United States Letters Patent No. 2,217,842, issued to Harry H. Lamar October 15, 1940, and Letters Patent of the Dominion of Canada No. 405,-411, issued June 16, 1942, relating to Valves, said license being exclusive in the field of valves for equipment and mechanisms for incorporation in airplanes of all kinds and airships which are lighter than air.

"Whereas, Henry wants to be free to engage in the manufacture of valves for equipment and mechanisms for incorporation in airplanes of all kinds and airships which are lighter than air after January 1, 1947, and therefore is desirous of acquiring a nonexclusive, indivisible license to manufacture and sell valves embodying the features of said patent in such field;

"Now, Therefore, for and in consideration of the payment by Henry of One Dollar ($1.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Schoenberger, and for and in consideration of the premises and covenants hereinafter set forth and to be faithfully performed, Schoenberger and Henry agree as follows:

"Article I—Grant

"Schoenberger hereby grants to Henry a nonexclusive, indivisible, nonassignable license under the aforesaid Letters Patent to make, use and sell valves embodying the features of said invention throughout the United States and Canada and other countries in which corresponding patents may be obtained for equipment and mechanisms for incorporation in airplanes of all kinds and airships which are lighter than air.

"Article II—Royalties And Reports

"(a) Henry covenants to pay royalties to Schoenberger at the following rate, on the net sales price, five per cent (5%) on the first $500,000.00 of such sales, four per cent (4%) on the next $250,-000.00 of such sales, and three per cent (3%) on all over $750,000.00 of such sales, each year, embodying the invention covered by said Letters Patent and falling within the scope of the license granted in Article I hereof.

"(b) The royalties shall be computed quarterly and within thirty (30) days after the first days of January, April, July and October of each calendar year during the continuance of this agree-

The agreements were found confusing and complicated and oral testimony became necessary to understand the purposes of the patent.

The inquiry which the Court conducted or permitted in this matter did in no way seek to secure evidence to alter, modify, abrogate, or change the agreements.

ment, Henry shall furnish Schoenberger with a written statement, verified if Schoenberger shall so request, of all licensed valves coming within the terms of this agreement and sold or put into use by Henry during the then next preceding calendar quarterly period, and the prices at which they were sold or put into use, and in such detail as to enable the royalties payable hereunder to be computed, except that the first such report shall include the number and description of licensed valves used or sold by Henry between the effective date of this agreement and the date of such report. Henry shall, at the time of rendering said statement, or within fifteen (15) days thereafter, pay to Schoenberger, or someone designated by Schoenberger, the amount of royalty shown to be due by such statement. If, during any quarterly period, no licensed valves coming within the terms of this agreement shall have been sold or put into use by Henry, a statement to this effect shall be rendered in the same manner as if sales had been made.

"(c) Valves shall be considered sold or put into use when billed out, or if not billed out, then when delivered or put into use, or when paid for if paid for before delivery; but royalties paid on such valves lost or damaged in transit for which the licensee is not reimbursed by insurance payments, or valves not accepted by the customer, or returned by the customer for credit shall be credited on future royalty payments.

"Article III—Minimum Sales Price

"The license herein granted is subject to the express limitation that if and when after January 1, 1947, Schoenberger shall serve on Henry a schedule of the minimum net prices which Schoenberger is then observing for the sale of any particular protected valve falling within the scope of the license grant of Article I hereof, Henry shall, commencing ninety (90) days after such service, refrain from selling or offering for sale the herein licensed valves at prices less than said minimums and Schoenberger shall do likewise, and neither Henry nor Schoenberger in connection with any negotiations for the sale of said valves shall offer directly or indirectly to a customer any other merchandise at less than going prices or any other condition, the effect of which might be for either party to

sell licensed valves at any prices less than those established by Schoenberger and communicated to Henry. Should either Henry or Schoenberger sell any of said valves within the field covered by this license at a net price which is less than the minimum price established by Schoenberger for the sale of valves of the same size, or otherwise violate the terms of this article, the party making the offending sale or sales shall upon all the available facts being called to its attention by written notice from the other party immediately discontinue such practice and pay to the other party as liquidated damages its entire profits on the offending sale or sales, or an amount equal to ten per cent (10%) of the total amount of said sale or sales, whichever is greater, and until such payment is received by the other party the latter shall not be obligated to observe the prescribed minimums. Schoenberger may permanently abolish the minimum price features of this license at any time upon giving Henry ninety (90) days' advance notice of the same. Henry shall be relieved from observing the minimum price features of this license should Schoenberger make more than two sales in any one calendar year at prices below the prescribed minimums. By the term 'net price' as used herein is meant the price which the customer is actually required to pay after deduction of the usual trade discounts. The purpose of this provision is to prevent either party from underselling the other. It is further provided that after the effective date of this license agreement when Schoenberger has established minimum prices for valves under this license, it will not change such established prices, unless labor and material costs entering into the cost of manufacture and sale of the valve shall increase or decrease in excess of ten per cent (10%), unless Schoenberger shall first obtain the consent of Henry.

"Article IV—Construction Of Patents

"If, in any proceeding in which the validity, infringement or priority of invention of any claim of the said Letters Patent is in issue, a judgment or decree is entered which becomes not further reviewable through the exhaustion of all permissible applications for rehearing or review by a superior tribunal, or through the expiration of the time permitted for such application (hereinafter referred to

Since the original patent was applicable to sixteen different technical circumstances, which, in turn, were subject to four generalized uses, and since the various agreements stemmed from the terminology of the original patent, this Court found it im-

as an 'irrevocable judgment'), the construction placed upon any such claim by such irrevocable judgment shall be thereafter followed not only as to such claim, but to all claims to which such construction applies, with respect to acts occurring thereafter; and, if such irrevocable judgment holds any claim invalid or is adverse to the patent as to inventorship, Henry shall be relieved thereafter from including in its reports hereunder licensed products sold thereafter covered only by such claim or by any broader claim to which such irrevocable judgment is applicable, and from performance of those other acts which may be required by this agreement only because of such claim; provided, however, that if there are two or more conflicting irrevocable judgments with respect to the same claim, the decision of the higher tribunal shall be followed thereafter, but if the tribunals be of equal dignity, then the decision more favorable to the claim shall be followed until the less favorable decision has been followed by the irrevocable judgment of another tribunal of at least equal dignity.

"Article V—Term And Termination

"(a) This agreement, unless sooner terminated, shall extend for the full life of the Letters Patent under which this license is granted.

"(b) In the event that Henry at any time fails to make the quarterly statements, or fails to pay the royalty in the manner hereinbefore provided, or otherwise fails to comply with the provisions of this agreement, Schoenberger shall have the option of treating this agreement as in full force and effect and taking proper steps to recover royalties payable hereunder, or of canceling this license and agreement provided, however, that in case Schoenberger elects to cancel this agreement he shall first mail or otherwise send to Henry a written notice of his intention, together with a statement as to the grounds upon which the intended action is based. If, within thirty (30) days after the receipt of such notice, Henry shall have met the objections presented by Schoenberger and shall have complied with the provisions of this agreement, then the notice shall become null and void and of no effect, but otherwise the notice shall remain effective and the license and agreement shall cease and terminate at the expiration of thirty (30) days last mentioned above.

"(c) If Henry shall become insolvent, or if any petition in bankruptcy shall be filed by or against it, or if a receiver or trustee shall be appointed for any part or all of its properties, then this agreement and all licenses and rights granted to Henry hereunder may be terminated by Schoenberger by five (5) days' written notice of his intention to terminate the same herein.

"(d) No cancellation or termination as provided for in this agreement shall release Henry of its liability for any royalties that may have accrued prior to such cancellation or termination, respectively.

"Article VI—Patent Marking

"Henry agrees that it will mark licensed valves sold or put into use under this license with the word 'Patent,' followed by the number of said Letters Patent, and that it will comply with any other reasonable requirements with respect to patent marking made from time to time by Schoenberger.

"Article VII—Engineering Service

"After January 1, 1947, Schoenberger upon request from Henry Valve Company shall make available to the Henry Valve Company engineering information on valves falling within the scope of this license which Schoenberger may be manufacturing and should the Henry Valve Company require engineering service to interpret such engineering information supplied by Schoenberger, such service will be supplied by Schoenberger from time to time at the rate of Twenty-five Dollars ($25.00) per day per man plus traveling and living expenses. It is further understood and agreed that Schoenberger shall not be required to provide more than one man at one time under the provisions of this paragraph.

"Article VIII—Successors And Assigns

"This agreement and the covenants herein contained, except as otherwise expressly provided, shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

"In Witness Whereof, the W. J. Schoenberger Company and the Henry Valve Company have respectively caused these presents to be signed by their proper officers thereunto duly authorized."

perative to request testimony to simplify and clarify those terms used in patent parlance but not understandable to the layman.

Once the terminology was defined and made clear, the agreements spoke for themselves and the issue resolved itself into the application of the agreements to the law.

■ Where the language of a contract is plain and unambiguous, the court will not resort to construction but will enforce the contract according to its terms. New York Life Ins. Co. v. Jackson, 304 U.S. 261, 58 S.Ct. 871, 82 L.Ed. 1329; Great Lakes Towing Co. v. Bethlehem Transportation Corp., 6 Cir., 1933, 65 F.2d 543; Provident Trust Co. of Philadelphia v. Metropolitan Casualty Ins. Co., 3 Cir., 152 F.2d 875; General Finance Co. v. Pa. T. & F. M. C. Ins. Co., 348 Pa. 358, 35 A.2d 409.

■ Where the rights of respective parties are dependent upon a contract, unless that instrument is ambiguous, the intention of the parties must be determined by the words of the contract, unaided by oral testimony. Rock-Ola Mfg. Corp. v. Filben Mfg. Co., 8 Cir., 168 F.2d 919.

■ In determining whether or not there is an ambiguity requiring an interpretation, the whole contract must be considered and not an isolated part. Buchanan v. Swift, 7 Cir., 130 F.2d 483; Fraser Fund v. Fraser, 350 Pa. 553, 40 A.2d 22; DeChicchis v. Elizabeth Borough School District, 142 Pa. Super. 94, 15 A.2d 492.

■ A contract is ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions; it is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends. 17 C.J.S., Contracts, § 294 and cases there cited; Whiting Stoker Co. v. Chicago Stoker Corp., 7 Cir., 171 F.2d 248; Zehnder v. Michaud, 8 Cir., 145 F.2d 713.

■ Contracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction. An ambiguous contract is one capable of being understood in more senses than one; an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning. Contracts are not rendered ambiguous by the mere fact that parties do not agree upon their proper construction. Whiting Stoker Co. v. Chicago Stoker Corp., supra.

■ Where a contract is ambiguous, evidence of extrinsic circumstances may be received to show that the parties themselves have adopted a permissible method of applying its terms to the subject matter. Zehnder v. Michaud, supra.

■ Where parol evidence is admissible to alter the terms of a written contract, it must first appear that the contract is incomplete and that the evidence sought to be introduced in no way conflicts with what is written. American Sumatra Tobacco Corp. v. Willis, 5 Cir., 170 F.2d 215.

■ The courts are not permitted to make contracts for party litigants and are only empowered to construe the language and meaning of contracts made and entered into as they are intended and understood by the parties. In the absence of fraud, accident or mistake, parol evidence is not admissible to vary, alter or contradict terms of a complete and unambiguous written contract. American Sumatra Tobacco Corp. v. Willis, supra.

This is not a case where the parties are just unable to agree upon the proper construction to be placed on the contracts in suit. A situation exists where the contracts are capable of being understood in more senses than one without an explanation as to the purposes of the patent.

There is no question in my mind that language used in patent agreements and contracts is peculiar and unique to the patent field. Of course, it is English, but it is a peculiar brand in many respects. There are words which have specialized meanings within the context or framework of patent practice and what might be called patent jargon.

■ The admission of parol evidence in this proceeding was not to contradict or vary the terms of the written agreements. It was for the purpose of explaining the meaning of the contracts as they related to the patent rights given, received or re-

tained by Taxpayer. The parol testimony was proper and necessary; otherwise the Court could not have seen the trees for the forest.

To be chronological in approaching the problems which exist, determination must first be made of the legal effect to be given the various agreements entered into between—

(1) Taxpayer and Henry

(2) Henry and Taxpayer

(3) Taxpayer and Schoenberger, and

(4) Schoenberger and Henry

This is necessary before any consideration can be given the question of Tax Law to be applied as taken from the requirements of the Internal Revenue Code.

Do the agreements between Taxpayer and Henry constitute a sale or assignment of the whole or part of the patent or a license to use part of the patent?

Legal effect to be given the agreements between—

(1) Taxpayer and Henry

(2) Henry and Taxpayer

The courts have generally followed basic patent law rules laid down by the United States Supreme Court and the other federal courts in determining whether a patent has been sold or exchanged or merely licensed. General Aniline & Film Corp. v. Comm. of Internal Revenue, 2 Cir., 139 F.2d 759; Myers v. C. I. R., 1946, 6 T. C. 258; Kimble Glass Co. v. C. I. R., 1947, 9 T.C. 183.

Whether the agreements in this case constitute assignments or licenses is governed by federal law in general and federal tax law specifically. Patents are provided for in the Constitution and governed by federal statutes. 35 U.S.C.A. § 31 et seq.

A patent is property, title to which passes from the inventor only by assignment, and also no particular form of words is required, a written instrument of transfer must be unambiguous and show a clear intent to part with the patent. Marshall v. Colgate-Palmolive-Peet Co., 3 Cir., 175 F. 2d 215; McClaskey v. Harbison-Walker Refractories Co., 3 Cir., 138 F.2d 493.

A patent confers upon the owner the exclusive right to manufacture, use and sell the invention for the life of the patent. In order to constitute a valid assignment of his patent, the owner must transfer all of these rights, either in whole or in undivided part, the grant of anything less being a mere license which conveys no proprietary interest to the licensee. Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923; United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362.

The law seems to be settled that an assignment of the patent is not invalidated because an invention is assigned before a patent issues or because there is a reservation of royalties. Kenyon v. Automatic Instrument Co., 6 Cir., 160 F.2d 878; Rude v. Westcott, 130 U.S. 152, 9 S.Ct. 463, 32 L.Ed. 888; John Tuman & Sons, Inc., v. Basse, 2 Cir., 113 F.2d 928.

Whether the transfer of an interest or right under a patent is an assignment or a license does not depend upon the name by which it is called, but upon the legal effect of its provisions. No particular form is required for an assignment, but the instrument of transfer must be unambiguous and show a clear and unmistakable intent to part with the patent. Waterman v. Mackenzie, supra; Kenyon v. Automatic Instrument Co., supra.

Thus a grant of the exclusive right to make, use and vend the invention for the life of the patent has been held to be an assignment, notwithstanding that the instrument was described as a "license" and the parties were designated as "licensor" and "licensee." Bailey v. Commissioner, 15 T.C. 468; Myers v. Commissioner, 6 T.C. 258; Parke, Davis & Co., v. Commissioner, 31 B.T.A. 427; W. B. Davis & Son v. Commissioner, 5 T.C. 1195. Since a patent confers on the owner the exclusive right to make, use, and sell the invention for the life of the patent, a grant by the owner of these complete rights divests him of all interests in the patent and operates as a sale or an assignment.

The Collector most urgently contends that Taxpayer's case is based upon the er-

roneous theory that assignments of proprietary interests in the patent for each field in which the invention can be used may be assignable, when in reality a patent cannot be so split up and sold piecemeal.

The authorities which the Collector cites neither hold to this view nor represent the weight of the authority, and can be distinguished.

In E. W. Bliss Co. v. United States, 253 U.S. 187, 40 S.Ct. 455, 64 L.Ed. 852, the patentee was obligated to defend the license and to assume the expenses for any suit against infringers, which was indicative of a reservation of title in the patentee.

Rohmer v. Commissioner of Internal Revenue, 2 Cir., 153 F.2d 61, holds that all rights conferred by copyright must be transferred in order to constitute a sale under the Revenue Code. But, clearly, a publication is not subject to a breakdown into varied functions as is a machine or valve, and the fact that a publication is indivisible does not render a mechanism so.

In Collins v. Hupp Motor Car Corp., 6 Cir., 22 F.2d 27, the patent rights were mutually shared between the patentee and licensee, and no exclusive grant of any part thereof was perfected. Similarly, in General Motors Corp. v. Blackmore, 6 Cir., 53 F.2d 725, power to make settlements for past infringements or the granting of licenses was mutually shared by patentee and licensee, and no unlimited grant of an undivided part was perfected.

In DeForest Radio Telephone & Telegraph Co. v. Radio Corporation of America, 3 Cir., 20 F.2d 598, the patentee and licensee shared the responsibility of manufacturing.

The case of Gamewell Fire Alarm Telegraph Co. v. City of Brooklyn, C.C., 14 F. 255, does not dispute the power of a patentee to assign an undivided part of an entire patent, but holds that a segregated right for a particular employment of the invention is non-assignable. Relying upon this same authority, a similar opinion is expressed in Fauber v. United States, 37 F.Supp. 415, 93 Ct.Cl. 11. If a patent is divisible in part, so that it may be employed to perform different functions, I

do not feel that the above language rules out a power to assign such patent for such distinct and separate functions.

In Deitel v. Chisholm, 2 Cir., 42 F.2d 172, the court treated the exclusive right throughout the United States to use, manufacture and sell or to license others to use, manufacture, or sell, vanity cases as constituting an exclusive license, wherein the licensee retained a sufficient proprietary interest to sue infringers. In so far as the court failed to recognize such transaction as an actual sale of an undivided part of the patent interest, I am of the belief that the Court did not represent the majority viewpoint.

The owner of a patent may assign it to another and convey, (1) the exclusive right to make, use and vend the invention throughout the United States, or, (2) *an undivided part or share of that exclusive right*, or (3) the exclusive right under the patent within and through a specific part of the United States. But any assignment or transfer short of one of these is a license, giving the licensee no title in the patent and no right to sue at law in his own name for an infringement. United States v. Gen. Electric Co., supra; Kenyon v. Automatic Instrument Co., supra; Walker on Patents, Deller's Edition, Vol. II, page 1400 et seq.; Gayler v. Wilder, 10 How. 477, 51 U.S. 477, 13 L.Ed. 504; Littlefield v. Perry, 21 Wall. 205, 88 U. S. 205, 219, 22 L.Ed. 577.

It is my judgment that the clear and unmistakable intent to part with the patent is clearly present here.

The first paragraph of the December 9, 1939 agreement states: "Taxpayer hereby grants unto Henry an exclusive license under said inventions, and under any and all patents which may issue on said application or for said inventions, to manufacture, use and sell valves embodying said inventions, throughout the United States and all foreign countries."

It is of no moment that in paragraph 6 of this agreement Taxpayer reserved the option to terminate the agreement if the royalties were not paid as provided and in paragraph 11 in the event of bankruptcy for termination and revesting of

title in Taxpayer. These are common provisions nearly universally found in patent agreements. An individual of inventive mind rarely has the ability, financial or otherwise, to produce and market his invention. He has to depend upon others and it is a means of self-protection to include such clauses; otherwise he is at the mercy of the assignee. It is the only control he has. The equity power of a court could not be availed of to compel specific performance. By the very nature of the relationship such clauses are included and to penalize the assignor by holding that such clauses make the sale a license is arbitrary and inequitable. Furthermore, the courts have recognized this and it is well settled that such clauses do not interfere with the passing of ownership (title) from the assignee, but operate as conditions subsequent. Waterman v. Mackenzie, supra; Commissioner v. Celanese Corp., 78 U.S. App.D.C. 292, 140 F.2d 339; Myers v. C. I. R., supra; Kimble Glass Co. v. C. I. R., supra; Raymond M. Hessert, 1947, 6 TCN 1190.

The fact that the purchase price of the patent was to be paid on a certain percentage of the net sales of the product which was made, used, or sold from the invention, does not prevent the vesting of title to the property in the individual to whom the patentee assigns his rights. Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 126 F.2d 406.

The parties are not required to be clairvoyant or prescient and determine beforehand a lump amount; it is a matter of speculation. The patent may be commercially marketable or it may not be and the parties account for this risk by providing for installment payments based on a percentage of sales. Congress has recognized this and provided in Section 44(b) of the Internal Revenue Code, 26 U.S.C. § 44(b), that capital gains may be reported over a period of years. These installments have often been designated as "royalties," and the amount to be paid has been measured by the annual use of the patent by the purchaser.

Collector places considerable emphasis on paragraph 5 of the agreement, and contends that its limiting language indicates a reservation of title in the inventor. This paragraph provides: "In the event Henry finds it necessary to sublicense one or more users of valves under said inventions, Henry may grant sub-licenses to users of valves, at a royalty of not less than five per cent (5%), *limited to valves supplied with or for use of refrigeration equipment sold by said users,* and Henry agrees to pay to Taxpayer one-half of the royalties received by Henry from said users on the latter's production." (Italics supplied.)

Collector asserts that the inventor apparently reserved title in himself in that he limited Henry's right of sub-license to the refrigeration field, although the invention had several uses.

To construe this language as a reservation of title in the inventor would appear far fetched and place exaggerated emphasis upon a single phrase, when the entire instrument must be viewed in accordance with its general tenor.

The paragraph is in some ways ambiguous and not clear; but by reading the document as a whole and placing this paragraph in its proper setting, the following appears to be a reasonable interpretation.

There is no restriction on the granting of sub-licenses to make, use and sell the patent. Taxpayer conveyed everything he had away. The only restriction involved applied to royalties in the refrigeration field. In other words, in the event Henry whose principal production was that of producing valves for refrigeration purposes, wished to grant a sublicense to a user in this field (not to make, use and sell the valve, but only use it for refrigeration purposes, etc.) then since Henry would lose its profit on the sale of the valve, Taxpayer agreed to take a 50% reduction in royalty. The restriction, therefore, only applied to royalties by a refrigeration user (not a manufacturer or seller) and there was no restriction on the granting of a sub-license to make, use and sell the patent.

This is the proper and logical interpretation because Taxpayer was not interested in restricting sub-licenses. Why should he be? It was to his advantage to have Hen-

ry grant sub-licenses because it increased his royalties. Collector's interpretation implying that something remained in Taxpayer is rebutted by the fact that in order to get more uses for the valve, he was forced at a later time to purchase an interest in an undivided portion of the patent because of the inability of Henry to go into these other fields.

The interest purchased or release back agreements of August 6, 1942 and January 15, 1943, have no affect on what the agreement of December 9, 1939, was, nor do they convert the 1939 agreement from a sale into a license.

The first supplemental agreement was entered into with Henry after the Taxpayer left the employ of that company. Taxpayer went with Henry on August 1, 1939, as a design engineer at a fixed salary. Taxpayer was unable to develop his patent himself; he didn't have the resources but Henry did and as a result after Taxpayer had been with the company for a short time and saw the possibilities of Henry being able to produce his patent, he sold it to them complete on December 9, 1939, approximately four months after he began work with them. Taxpayer stayed with Henry for over two and one-half years and engineered this patent and got it into production because Henry did not have the engineering know how. By that time he knew the potentialities of the company and the probability of it going into the "high-pressure" field and the "airplane field". This was in the midst of World War II and his patent had great possibilities if developed. Therefore, when Taxpayer saw that Henry wasn't in a position to go into those two fields he asked for those two fields back—a perfectly normal and logical thing to do. Henry knew they had a valuable patent and were not going to give up any part of it without some benefit to them, and Taxpayer paid valuable consideration for the rights he received.

In the original agreement there is a conveyance of the entire patent and, therefore, an assignment or sale. The supplemental agreements provide for a reservation or a right on the part of the taxpayer patentee to apply the invention himself or through third persons to certain specified purposes. The instruments, therefore, must be construed as a conveyance of the title to the patent, with a license back from the assignee to the patentee, or from Henry to Taxpayer. Littlefield v. Perry, supra.

I conclude, therefore, that the agreement and supplemental agreements between Taxpayer and Henry constituted a sale or assignment of all rights which Taxpayer had in the grants of the patent, with a license back for two fields or purposes of the patent in Henry or his assignee.

Legal effect to be given agreements between—

(1) Henry and Taxpayer

(2) Taxpayer and Schoenberger

(3) Schoenberger and Henry

Unquestionably, for the purpose of ascertaining the intention of the parties in making their contract, all the instruments, each referring to the other, are to be construed together. If, when so construed, they shall be found to convey to the assignee, Henry, the title to the patent and inventions, the rights and privileges given by Henry to Taxpayer amount to not more than the granting back of a mere license from the assignee to the patentee. Littlefield v. Perry, supra.

Wholly apart from other shortcomings, the grant back to Henry and from Henry to Schoenberger fails to qualify as an assignment since it did not convey the complete right to make, use, and vend the invention in one of the two fields to which it related. Under the various contracts, Henry retained the joint right to make valves in the high-pressure and aviation fields. Therefore, Schoenberger had neither a complete nor an exclusive right to the patent in either fields, and consequently its rights were only those of a licensee.

It is my judgment that the rights secured by Taxpayer from Henry, which culminated in agreements between Henry and Schoenberger, and Schoenberger and Henry, did not constitute an assignment or sale but, on the contrary, amounted to a license.

To recapitulate, I am satisfied that in the field of patent law the various agreements, which must be considered together, require the following conclusions:

(1) The agreement between Taxpayer and Henry constituted an absolute assignment or sale of all rights in the patent.

(2) The agreements between Henry and Taxpayer, Taxpayer and Schoenberger, and Schoenberger and Henry, constituted a license rather than an assignment or sale to manufacture, make and use the patent in the fields of high-pressure gases and aviation. Henry merely licensed back to Taxpayer a joint right to participate in these specialized fields, reserving in Henry a corresponding, co-extensive right. It is axiomatic that, regardless what language the agreements between Henry and Schoenberger may have employed, Schoenberger, as assignee of Taxpayer, could secure no greater rights than Taxpayer possessed, and consequently as between all the parties the agreements never rose above the status of a license.

The problem now resolves itself into the application of appropriate provisions of the Internal Revenue Code as to the basis to be applied for the computation of the tax owed by Taxpayer, as based upon payments received on agreements from Henry and Schoenberger.

Simply stated, the problem is whether the proceeds which eminate from the patent rights of the taxpayer should be taxed as ordinary income or long-term capital gains, or whether "royalty" payments received by Taxpayer from Henry and Schoenberger were taxable as ordinary income, as contended by the Government, or as long-term capital gains, as contended by Taxpayer.

The question is one of federal taxation which is governed by federal statute and the transactions are within the purview of those statutes, and whether an instrument constitutes an assignment at common law or is an assignment under the law of a particular state is immaterial. The question is whether it is what purports to be within the meaning of the Internal Revenue Code.

The applicable statutes are:

Sec. 117 [as amended by Sec. 115(b), Revenue Act of 1941, c. 412, 55 Stat. 687, and Secs. 150(a) and (c) and 151(a), Revenue Act of 1942, c. 619, 56 Stat. 798]. CAPITAL GAINS AND LOSSES.

(a) Definitions.—As used in this chapter—

"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer;

"(2) Short-term capital gain. The term 'short-term capital gain' means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing net income;

\* \* \* \* \* \*

"(b) Percentage taken into account. In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:

"100 per centum if the capital asset has been held for not more than 6 months;

"50 per centum if the capital asset has been held for more than 6 months." 26 U.S.C. 1946 ed., § 117.

In filing his income tax returns for 1944, 1945 and 1946, Taxpayer treated his contracts with Henry and Schoenberger as licensing agreements under which he remained the proprietor of the valve patent. As a result, he reported the payments received by him as ordinary income, and, consistently, he took deductions for depreciation on the patent.

Thereafter, however, he filed refund claims, and, on their denial, brought the present action, asserting that his contracts with Henry and Schoenberger affected sales of the patent, rather than mere licenses.

The reason for this reversal may be found in the provisions of the revenue laws according preferred treatment to gains realized from the sale or exchange of capital assets. Section 117(a) and (b) of the Internal Revenue Code. As applied here, those provisions require taxation of only 50% of the gain realized on the sale or exchange of a long-term capital asset.

To avail himself of the benefits of Section 117, it is incumbent upon Taxpayer to establish: (1) That the property in question is a "capital asset", as defined in Section 117(a); (2) that it has been held for more than six months; and (3) that there has been a "sale or exchange" of the property. General Aniline & Film Corp. v. Commissioner, 2 Cir., 139 F.2d 759.

A capital gain is a gain from the sale or exchange of assets which comes within the statutory definition of capital asset as provided in Section 117(a) (1) of the Internal Revenue Code. Special treatment for tax purposes is accorded in the case of a capital asset in recognition of the fact that gain or loss resulting from such asset held over a certain period of time is not properly assignable in its entirety to a single taxable year.

In the case of a taxpayer, other than a corporation, only fifty percent of the recognized gain or loss upon the sale or exchange of an asset held for more than six months is taken into account. If the capital asset was held for not more than six months, the entire gain or loss is taken into account.

The basis for determining gain or loss of a patent is its cost adjusted for capital charges, losses and depreciation. The plaintiff here claims no basis and concedes that the amounts he received during 1944, 1945 and 1946 were gain, the question being, what kind of gain, i. e., whether it was ordinary gain or capital gain.

In view of the conclusion that the agreement consummated between Taxpayer and Henry constituted a "sale or exchange" in conformity with Section 117 of the Internal Revenue Code, for plaintiff to avail himself of the benefits of Section 117, he must further prove (1) that the property in question is a "capital asset," as defined in Section 117(a) and (2) that it has been held for more than six months.

(1) Collector contends that the patent was not a "capital asset," but under Section 117(a) (1) (A) was "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business".

The Internal Revenue Code in Section 117(a) (1) defines a "capital asset" more by exclusion than it does by inclusion. However, in general so far as patents are concerned, if the income-producing activity in connection with a patent is an isolated or casual affair or a mere hobby or recreation, the patent is a capital asset. John W. Hogg, 1944, 3 T.C.M. 212; Maurice B. Cooke, 1945, 4 T.C.M. 204; Myers v. C. I. R., 1946, 6 T.C. 258; U. S. v. Adamson, 9 Cir., 161 F.2d 942; Hofferbert v. Briggs, 4 Cir., 178 F.2d 743.

The record shows that Taxpayer had been engaged over a period of years in design engineering work. He was employed by others at a fixed salary. That some time incident to his work and on company time he made patentable improvements on valves but on his own time at home and at his own expense he conceived and reduced to practice, thereby acquiring a property right thereto, the invention under consideration in this case. That he did not have the means personally to manu-

facture and sell the patent, but instead chose to convert his property right by transferring it to Henry in exchange for a contract providing for payment in installments. That by transferring what was practically his one and only invention, he "sold" a "capital asset" and was not transferring property held primarily for sale to customers in any trade or business conducted by him.

In 1939, the year of the sale to Henry, the holding period for long-term capital gains was eighteen months. Revised Act, 1939, Sec. 117(a) (4). For the years in question, 1944, 1945 and 1946, the holding period had been reduced to six months. Revenue Act 1942, Sec. 150(a) (1). The holding period required in order to gain the benefits of the capital gain rates is governed by the taxing statute in effect the year the income is received. Dreymann v. C. I. R., 1948, 11 T.C. 153. In other words, when a person chooses to spread the tax over the period of installments, Section 44, I.R.C. he also assumes the risk that the rate of tax might change or that the proportionate amount of capital gain to be taken into account might change upward or downward. See Golden v. C. I. R., 1942, 47 B.T.A. 94.

The important consideration here is when was the patent conceived and reduced to practice because taxwise it is settled that an inventor's property right in his invention does not come into being upon his obtaining a patent, but exists prior to that time upon his reduction of an original invention to actual practice, and that date marks the beginning of the holding period. Dreymann v. C. I. R., supra; Barlow, 1943, 2 T.C.M. 133; Myers v. C. I. R., supra; Diescher v. C. I. R., 1937, 36 B.T.A. 732. The record is clear that this was accomplished on April 22, 1938, the date the idea was reduced to a drawing, or at the latest April 23, 1938, the date the successful test was made.

In any event, whether the applicable holding period is six months or eighteen months, since the plaintiff completely conceived and reduced the patent to actual practice by April 23, 1938, at the latest, and the sale to Henry was made on December 9, 1939, his actual holding period was in excess of eighteen months.

All told, Taxpayer might be said to have eight inventions, six of them subject to the shop-right doctrine and with five of the six he had no alternative but to assign them and on only two of which did he personally ever hold a patent. The patent involved in this case cannot be said to be "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," nor is it stock in trade, nor is it inventoriable property. Taxpayer had no customers. He had only one patent which he could call his own and made only two sales of patents in his life time (both involving the same patent).

It is my judgment that the sale of said patent to Henry constituted a sale of a "capital asset" as defined in Section 117(a).

(2) It is my further judgment that Taxpayer held the patent the required time period to claim capital gain rates.

Taxpayer is, therefore, entitled to judgment for the tax based on the income received from Henry on the original and two supplemental agreements, but not including income received from the high-pressure valve or aviation industry fields.

Collector is entitled to judgment for the tax based on the income received by Taxpayer from Henry or Schoenberger in the high-pressure valve or aviation industry fields. Interest held by Taxpayer was a license in said two fields rather than receiving an assignment or title thereto.

It is my conclusion that the payments received by Taxpayer from Henry on the manufacture, sale or use of the patent in the refrigeration or general use field entitled Taxpayer under the Internal Revenue Code to compute his income tax on the basis of a long-term capital gain, said rights constituting a sale or assignment.

I also conclude that the payments received by Taxpayer from Henry or Schoenberger on the manufacture, sale or use of the patent in the high-pressure or aviation fields require Taxpayer under the In-

ternal Revenue Code to compute his income tax on the basis of ordinary income, said rights operating only as a license to use jointly by Henry or Taxpayer, or the assignee of Henry who is Schoenberger.

The United States filed its petition for leave to intervene herein for the purpose of asserting a counterclaim for additional taxes which have been assessed against Taxpayer for 1946.[7]

Section 3740 of 26 U.S.C.A. provides: "No suit for the recovery of taxes * * * shall be commenced unless the Commissioner authorizes or sanctions the proceedings and the Attorney General directs that the suit be commenced."

The proposed intervention has been authorized by the Attorney General upon request of the Commissioner of Internal Revenue.

In his 1944, 1945 and 1946 income tax returns, the taxpayer claimed deductions under Section 23(a) (2) of the Internal Revenue Code for traveling expenses allegedly incurred in the operation, supervision, and maintenance of his valve patent. The deductions were first allowed in the office-audit of Taxpayer's returns, but after the filing of the claims for refund herein, Taxpayer was requested to furnish such records as he had supporting the claimed deductions. Upon being advised that Taxpayer had no such records, the Commissioner disallowed the traveling expense deductions for lack of substantiation, in accordance with Section 29.23(a)-2 of Treasury Regulations 111.

Internal Revenue Code:

Sec. 23 [as amended by Sec. 121(a), Revenue Act of 1942, c. 619, 56 Stat. 798].

DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

"(a) Expenses

   *    *    *    *    *    *

"(2) Non-trade or non-business expenses. In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income."

26 U.S.C.1946 ed., § 23.

On or about August 18, 1949, Collector issued and served upon Taxpayer notice and demand for the payment of the additional taxes. No part of said additional taxes and interest has been paid.

Sec. 272. Procedure In General. "(a) (1) Petition to Board of Tax Appeals. If in the case of any taxpayer, the Commissioner determines that there is a deficiency in respect of the tax imposed by this chapter, the Commissioner is authorized to send notice of such deficiency to the taxpayer by registered mail. Within ninety days after such notice is mailed (not counting Sunday or a legal holiday in the District of Columbia as the ninetieth day) the taxpayer may file a petition with the Board of Tax Appeals for a redetermination of the deficiency. No assessment of a deficiency in respect of the tax imposed by this chapter and no distraint or proceeding in court for its collection shall be made, begun, or prosecuted until such notice has been mailed to the taxpayer, nor until the expiration of such ninety-day period, nor, if a petition has been filed

7. "Motion To Intervene As A Defendant "The United States of America moves for leave to intervene as a defendant in this action in order to assert against the plaintiff a counterclaim which is not open to the original defendant, as set forth in the intervener's proposed answer, a copy of which is hereto attached. This motion is made on the following grounds: (1) The intervener has a substantial interest in the subject matter of this action; (2) the representation of its interest by the original defendant is or may be inadequate; (3) under the terms of Section 3772 of the Internal Revenue Code, as amended by Section 503 of the Revenue Act of 1942, the intervener may be bound by the judgment in this action; (4) the counterclaim of the intervener and the main action present common questions of law or fact.

        /s/ Edward C. Boyle
        United States Attorney,
Attorney for Applicant for Intervention"

44

with the Board, until the decision of the Board has become final." 26 U.S.C.1946 Ed., § 272.

Thereafter and on August 23, 1949, pursuant to Section 273(b) of the Internal Revenue Code, the Commissioner of Internal Revenue mailed a statutory notice of deficiency, or ninety day letter, to Taxpayer.

Sec. 273. Jeopardy Assessments.

"(a) Authority for making. If the Commissioner believes that the assessment of collection of a deficiency will be jeopardized by delay, he shall immediately assess such deficiency (together with all interest, additional amounts, or additions to the tax provided for by law) and notice and demand shall be made by the collector for the payment thereof. ·

(b) Deficiency letters. If the jeopardy assessment is made before any notice in respect of the tax to which the jeopardy assessment relates has been mailed under section 272(a), then the Commissioner shall mail a notice under such subsection within sixty days after the making of the assessment." 26 U.S.C.A.1946 Ed., § 273

The assessment not having been paid, the United States claims the right to intervene for the purpose of counter-claiming for such additional taxes.

Section 3744 of 26 U.S.C.A., 1946 Ed., provides:
"Suits for taxes

"Taxes may be sued for and recovered in the name of the United States in any proper form of action, before any district court of the United States, for the district within which the liability to such tax is incurred, or where the party from whom such tax·is due resides at the time of the commencement of the said action.

Section 1396 of 28 U.S.C.A. provides:
"Internal revenue taxes

"Any civil action for the collection of internal revenue taxes may be brought in the district where the liability for such tax accrues, in the district of the taxpayer's residence, or in the district where the return was filed."

Defendant Collector cannot recover an affirmative judgment against Taxpayer since judgments for taxes must be sought in the name of the United States. Jenkins v. Smith, 2 Cir., 99 F.2d 827.

The Court could not award the Collector an affirmative judgment for any taxes which may be due from Taxpayer and the Collector has not asked for such a judgment. If Taxpayer owes any taxes, the United States is the proper party to recover judgment for them, and it is for that reason that the Government seeks leave to intervene here.

Rule 24 of the Federal Rules of Civil Procedure, 28 U.S.C.A., provides: "(a) Intervention of Right. Upon timely application anyone shall .be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant is or may be bound by a judgment in the action; or (3) when the applicant is so situated as to be adversely affected by a distribution or other disposition of property which is in the custody or subject to the control or disposition of the court or an officer thereof."

On the merits, Taxpayer's opposition to the motion to intervene is two-fold: First, he contends that there is no right to intervene since the Collector can adequately represent the interests of the United States; and second, he argues that in any event the right to counterclaim is barred by Section 272(a) (1) of the Internal Revenue Code.

1. Not being able to obtain an affirmative judgment against Taxpayer, Collector cannot adequately represent the interests of the United States. If such a judgment is to be recovered, it must be by the intervener and not by Collector. Therefore, the intervention should be permitted pursuant to Rule 24(a) of the Federal Rules of Civil Procedure since Taxpayer concedes that the United States will be bound by the decision in this case.

2. The provisions of Section 272(a) (1), upon which Taxpayer relies, are as follows: "No assessment of a deficiency * * * and no * * * proceeding in

court for its collection shall be made, begun, or prosecuted until such [ninety-day] notice has been mailed to the taxpayer, nor until the expiration of such ninety-day period, nor, if a petition has been filed with the Tax Court, until the decision of the Tax Court has become final. *. * * "

Taxpayer's argument is that the counterclaim by the United States if for taxes which have been assessed as a deficiency; that taxpayer now has pending in the Tax Court a petition for redetermination of the deficiency; that under Section 272(a), supra, the United States is barred from instituting a "proceeding in court" to collect the deficiency until the decision of the Tax Court becomes final; and that the assertion of the counterclaim amounts to the institution of a "proceeding in court" contrary to the injunction of Section 272 (a) (1).

In making this argument, Taxpayer completely overlooks the fact that the restrictions of Section 272(a) (1) do not apply in the case of jeopardy assessments. Section 272(a) (2) of the Internal Revenue Code. The deficiency here arises under a jeopardy assessment made in accordance with Section 273(a) and (b) of the Internal Revenue Code. In absence of a bond posted by Taxpayer to stay collection, appropriate action may be taken to enforce payment of the deficiency before a final decision by the Tax Court. Section 273(f), (g) of the Internal Revenue Code. Since Taxpayer posted no bond here, the additional tax can be collected at any time, notwithstanding the pendency of the Tax Court proceeding.

■ Furthermore, while Section 272 (a) (1) prohibits a "proceeding in court" for the collection of a deficiency while the matter is pending in the Tax Court, it is doubtful that this prohibition applies to counterclaims asserted by the United States in a refund suit. Generally, the courts have upheld the Government's right to counterclaim under circumstances analogous to those presented here. Camp v. United States, 4 Cir., 44 F.2d 126; Ohio Steel Foundry Co. v. United States, Ct.Cl., 38 F.2d 144; Ellis v. Commissioner, 14 T. C. 484. These cases hold that where the taxpayer files suit to recover an alleged overpayment of income taxes, he opens the door for a correct determination of his entire tax liability, and if he has underpaid his taxes, the United States should be permitted to counterclaim and recover judgment for such taxes as may be due.

There is no reason why Taxpayer's liability for 1946 income taxes should be litigated piecemeal. Both parties were represented in court; evidence has been offered and the issue has been fully litigated. There is no need to burden court and counsel with the necessity of relitigating the identical issue at a later date in another forum and equally important, there would then be no possibility that the Government would be met in the Tax Court with the argument that although this Court declined to pass on the expense deduction issue, its decision nevertheless is res judicata as to all questions relating to Taxpayer's 1946 tax liability and the Tax Court is without jurisdiction to determine a deficiency for that year. Guettel v. United States, 8 Cir., 95 F.2d 229, 118 A.L.R. 1060, certiorari denied 305 U.S. 603, 59 S. Ct. 64, 83 L.Ed. 383.

■ Where property of the United States is involved in a litigation to which they are not technically parties under authority of an Act of Congress, the attorney for the United States may intervene. Stanley v. Schwalby, 147 U.S. 508, 13 S. Ct. 418, 37 L.Ed. 259.

■ The United States, through the Attorney General, may intervene in a suit or action by individuals against officers of the United States. Cyclopedia of Federal Procedure, 2 Ed., Volume VI, § 2445.

By permitting the intervention, no unfairness to the Taxpayer will result. Regardless of captions, the issues in this case could not change and the real party in interest is the United States and will always remain the same.

Rule 13 of the Federal Rules of Civil Procedure provides:

"Rule 13. Counterclaim and Cross-Claim

"(a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the

pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction, except that such a claim need not be so stated if at the time the action was commenced the claim was the subject of another pending action. As amended Dec. 27, 1946, effective March 19, 1948.

\*     \*     \*     \*     \*     \*

"(f) Omitted Counterclaim. When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, he may by leave of court set up the counterclaim by amendment."

The fundamental principles of justice demand that the issues of a controversy shall be adjudicated in a single action, and the rule, relating to counterclaims, is clearly designed in aid of such principles.

The petition for leave to intervene is granted.

Did Taxpayer erroneously claim deductions in his income tax return for traveling expenses under Section 23(a) of the Internal Revenue Code during the year 1946?

When Taxpayer filed his income tax return for the year 1946, he reported and claimed as a deduction from gross income traveling expenses in the amount of $4,536.80. It is claimed by the intervener, United States, that Taxpayer has failed to show in detail the nature and amount of the traveling expenses incurred by him in accordance with the provisions of Section 29.23(a)–2 of Treasury Regulation 111. That as a result thereof, Taxpayer has underestimated his 1946 net taxable income by the amount of $4,536.80, and understated and underpaid his income tax for the year 1946.

There is a prima facie presumption of the correctness attaching the Commissioner's action in disallowing these deductions which must be rebutted, or the right to the deductions must be denied. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623; Reinecke v. Spalding,

280 U.S. 227, 50 S.Ct. 96, 74 L.Ed. 385; Ruud Mfg. Co. v. Commissioner, 3 Cir., 45 F.2d 63; Evans v. Kavanagh, D.C., 86 F. Supp. 535.

For the year 1946, it was necessary for Taxpayer to make many trips to various parts of the country in order to further the use of his valve by giving the users technical help and advice. It is to be remembered that this was during the war years and his valve had a valuable place in the war effort. The construction and use of valves, especially high-pressure valves, and valves of this type used in the airplane industry, is a very technical process calling for a man highly skilled in that field. It is one thing to have the plans and drawings for a patent, but it is a very different thing to be able to produce that patent in commercial quantities and have it work. Not even an engineer without the knowledge and skill of this specialized field could fill the requirements.

Taxpayer was vitally interested in the successful operation of the valve wherever used, and it was he who got Henry set up on the production of the valve, and it was he who got Schoenberger interested in producing for the "high-pressure and airplane fields."

During 1946, Taxpayer made many trips which averaged about one trip every ten days. These were to places mainly in the eastern portion of the country and were on the average of two to three days in duration. So that for every ten days during 1946, Taxpayer was spending two to three days of that time on trips directly connected with the production of income.

In order to facilitate the manufacture and use required by this valve Taxpayer had a business car and during the gas rationing period a "C" card. At times it was more feasible to use the car for transportation than to go by rail. This car was used solely for business purposes, i. e., transportation for the operation, supervision and maintenance of the valve.

In determining whether the expense deductions should be allowed, in whole or in part, it is not necessary that Taxpayer be held to absolute certainty.

Such proof in this fast-moving business and social world is usually impossible. It, therefore, becomes necessary to make as close an approximation as is possible, bearing heavily upon Taxpayer whose inexactitude is of his own making. Hanson v. United States, Ct.Cl., 92 F.Supp. 972, 978; Cohan v. Commissioner, 2 Cir., 39 F.2d 540, 544; Marx v. Commissioner, 1 Cir., 179 F.2d 938.

▮ I have reviewed the record in this case to determine whether some other basis exists for allowing any of the ·disputed deductions, and believe the following would be proper for ·the year 1946 since they carry definiteness as to time, place and circumstances:

Traveling Expenses
1. Railroad fare, including tax, and automobile expense ....$1046.89
2. Hotel rooms ................ 284.50
3. Meals ..................... 636.55
4. Telephone, telegraph and entertainment .............. 513.20
5. Taxi, tips and miscellaneous .. 281.70
6. Trade journals ............ 27.75
7. Accounting and secretarial fees ..................... 254.50

Total ...............$3045.09

Findings Of Fact

1. The Court adopts and incorporates by reference the stipulation of facts which has been filed herein.

2. That the United States is entitled to intervene herein and its petition for leave to intervene is granted.

3. That the idea for the patent was conceived on February 5, 1935.

4. That at the time the idea was conceived, Taxpayer was employed on a fixed salary by Kerotest as a designing engineer.

5. That Taxpayer left the employ of Kerotest on April 1, 1938, and from April 1, 1938 to May 1, 1938, was unemployed.

6. That on May 1, 1938, Taxpayer accepted a position as designing engineer with Superior on a fixed salary, remaining there until August 1, 1939, when he accepted a position with Henry as a designing engineer at a fixed salary.

7. That Taxpayer remained with Henry until April 1, 1942.

8. That the valve patent was reduced to practice prior to May 1, 1938, while Taxpayer was unemployed, i. e., during the month after he left Kerotest and before he went with Superior.

9. That the original sketch was made on April 22, 1938 and tested successfully on April 23, 1938.

10. That the valve patent was developed by Taxpayer on his own time and at his own expense.

11. That the valve patent involved in this case had four fields of use, depending upon the material used in its construction, viz., (1) Refrigeration; (2) High-pressure; (3) Airplanes and (4) General application.

12. That the only other invention on which Taxpayer ever held a patent was the "ice-cuber" device developed on company time while working as a design engineer for Henry and which he assigned to them as part consideration for the license or release back of the "high-pressure field" and the "airplane field" from Henry on August 6, 1942.

13. Taxpayer was not an inventor by trade or in the business of inventing.

14. That Taxpayer held title to the valve patent from April 22, 1938 to December 9, 1939.

15. That the agreement of December 9, 1939 between Taxpayer and Henry was intended by the contracting parties as a sale or assignment.

16. That the agreements between Henry and Taxpayer were intended as a license, with right of joint use in the high-pressure and aviation fields in Henry and Taxpayer or his assignee, Schoenberger.

17. That Taxpayer or his assignee, Schoenberger, had the license or right to use jointly with Henry the "high-pressure field" and the "airplane field."

18. That Schoenberger paid $1,000 by check on or about April 30, 1943 direct to Henry, pursuant to agreement between Taxpayer and Schoenberger.

19. That Schoenberger paid $1,000 by check on or about June 10, 1943 to Henry,

pursuant to agreement between Taxpayer and Schoenberger.

20. That Taxpayer asked Henry to license the right to joint use of the patent in the "high-pressure field" and "airplane field" because Henry was unable to commercially develop them.

21. That Collector cannot adequately represent the interests of the United States herein since he cannot counterclaim in his own name for additional taxes due from Taxpayer.

22. That the proposed intervention by the United States has been requested by the Commissioner of Internal Revenue and authorized by the Attorney General.

23. That at the time this suit was instituted, more than six months had elapsed since Taxpayer filed his claims for refund.

24. That Taxpayer during 1946 made trips to various places to consult and advise on the use and maintenance of the valve, and conferred with the very highest authorities in the Air Force, Generals Arnold and Spaatz.

25. That Taxpayer made trips to consult with the major air carrier companies and numerous other trips to companies all having to do with the production, construction and use of the valve.

26. That Taxpayer had a business car, and during the gas rationing period a "C" card procured for him by Schoenberger, which was used solely for business purposes, i. e., transportation for the operation, supervision and maintenance of the valve when rail transportation was not feasible.

27. During 1946, Taxpayer expended the following sums in connection with his contracts with Henry and Schoenberger:

Traveling Expenses

1. Railroad fare, including tax, and automobile expense... $1046.89
2. Hotel rooms ................ 284.50
3. Meals ....................... 636.55
4. Telephone, telegraph and entertainment .............. 513.20
5. Taxi, tips and miscellaneous 281.70
6. Trade journals ............. 27.75
7. Accounting and secretarial fees ..................... 254.50

Total ............... $3045.09

Conclusions of Law

1. This Court has jurisdiction over the subject matter of the main cause of action and the counterclaim, as well as over the parties.

2. The agreement of December 9, 1939, between Taxpayer and Henry constituted a "sale" of the entire monopoly and proprietary interest in the valve patent with payment to be made in installments within the meaning of Section 117 (a) (4) of the Internal Revenue Code.

3. The property which Taxpayer sold to Henry on December 9, 1939, was a "capital asset" and was held by Taxpayer for more than six months within the meaning of Section 117 (a) (1) and (4) of the Internal Revenue Code.

4. The rights secured by Taxpayer from Henry and transferred to Schoenberger in the "high-pressure and aviation fields" constituted a license or non-exclusive joint right of use, and the income from which must be taxed as ordinary income.

5. Taxpayer is entitled to report the payments received from Henry for the years 1944, 1945 and 1946 from the manufacture, sale or use of the patent for refrigeration or general application, as long-term capital gains, as provided in Section 117 of the Internal Revenue Code.

6. Taxpayer is not entitled to report the payments received from Henry or Schoenberger for the years 1944, 1945 and 1946 from the manufacture, sale or use of the patent in the "high-pressure or aviation fields" as long-term capital gains, as provided in Section 117 of the Internal Revenue Code.

7. Taxpayer has overcome the presumption of correctness attaching to the Commissioner's action in disallowing the deductions claimed by Taxpayer.

8. Taxpayer is entitled to deduct from gross income the expenses referred to in Paragraph 27 of the Findings of Fact.

9. Plaintiff is entitled to judgment with interest against the defendant for the overpayment of income taxes for the years 1944, 1945 and 1946, equivalent to the difference between the tax paid and the amount computed to be due on the basis of the payments received from Henry on

the manufacture, sale or use of the patent in the refrigeration or general use fields.

10. Plaintiff is not entitled to judgment against the defendant for the income tax paid in the years 1944, 1945 and 1946, on the basis of payments received from Henry and/or Schoenberger on the right of use or license of the patent in the "high-pressure and aviation fields."

11. The United States is entitled to an affirmative judgment for the tax computed to be due for 1946 on the basis of permissible deductions in the amount of $3,045.09, rather than $4,536.80 which was the amount used when the return was filed in 1946.

An appropriate Order is entered.